**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| STATE OF MINNESOTA,<br><br>v.<br><br>GREGORY DONNELL MORGAN, JR.,<br><br>*Defendant*. | No. 26-CR-112 (NEB) |

**STATE OF MINNESOTA'S OPPOSITION TO DEFENDANT'S NOTICE OF
REMOVAL**

On February 5, 2026, Defendant Gregory Morgan was driving a rented black Ford
Expedition illegally along the shoulder of a Minnesota state highway, bypassing a line of cars
queuing as that highway merged with another. The defendant was employed as an agent with the
U.S. Immigration and Customs Enforcement ("ICE"). But the Ford Expedition had no markings
identifying it as connected to any law enforcement agency and did not display or use any lights or
sirens. Another motorist, entirely unaware that the unmarked vehicle was driven by an ICE agent,
moved partially onto the shoulder to slow down and block the defendant from jumping the queue.
After the motorist merged back into the queue, the defendant pulled alongside, rolled down his
window, and pointed a gun at the motorist and the motorist's front-seat passenger. For that
conduct, the State of Minnesota has charged the defendant under Minnesota law for assaulting the
motorist and the passenger with a dangerous weapon.

The defendant now seeks to remove his state criminal case to federal court. To do so, the
defendant attempts to transform his moment of road rage—committed on a state highway against
Minnesotan victims—into a federal enforcement action. But in our federal system, states retain
primary criminal law-enforcement responsibility. *See Mesa v. California*, 489 U.S. 121, 138

1

(1989). Consistent with a state's sovereign interest in protecting its residents and in adjudicating state-law offenses in state courts, the federal-officer removal statute does not permit removal of any or every case against a federal officer to federal court. Instead, a federal-officer defendant may remove a state prosecution to federal court only by establishing *both* a connection between the charged conduct and his federal authority *and* a colorable federal defense.

The defendant's removal notice is plainly deficient on both fronts. The defendant fails to explain how pointing a gun at a motorist while driving illegally along a highway shoulder is connected in any way to his duties as federal immigration agent. He equally fails to offer even a plausible account of why the Supremacy Clause immunizes his assaultive conduct as necessary or appropriate to carry out those federal immigration duties. The bare fact that he is a federal agent is not enough, as there is no "hierarchy of motorists" permitting the defendant to menace other drivers and "proceed as [he] please[s], notwithstanding state laws to the contrary." *North Carolina v. Ivory*, 906 F.2d 999, 1003 (4th Cir. 1990).

Because the defendant's removal notice rests on unsupported claims and is insufficient to meet the requirements of the federal-officer removal statute, the Court should remand this case to state court. If the Court does not "order . . . summary remand," 28 U.S.C. § 1455(b)(4), it should promptly hold an evidentiary hearing,[1] *id.* at § 1455(b)(5). There, the defendant must make a "detailed showing," *Willingham v. Morgan*, 395 U.S. 402, 409 n.4 (1969), and bears the burden to establish his entitlement to removal. Any such hearing would demonstrate what is already evident from the defendant's notice: that this case belongs in state, not federal, court.

---

[1] Contrary to the defendant's suggestion that the court may find "removal is proper on the face of [his] Notice," ECF No. 1 at 11, the federal-officer removal statute does not provide for summary removal. *See* 28 U.S.C. § 1442.

## I.    BACKGROUND

### A.  Relevant Facts[2]

The defendant is an Enforcement Removal Operations ("ERO") agent with ICE.  After 4 p.m. on Thursday, February 5, 2026, he was driving a black Ford Expedition eastbound on Minnesota State Highway 62 with another ICE agent in the back seat.  The Ford Expedition was a rental car with a Utah license plate.  The car had no markings or other insignia to identify it as a law enforcement vehicle.

According to a statement the defendant later made to state investigators, the defendant and his passenger were, at the time of the incident, driving to the Whipple Federal Building to end their shift and refuel the vehicle.  *See also* ECF No. 2 at 3 (the defendant's passenger described that they were "traveling 'back to base, last call'").  The defendant's vehicle encountered rush-hour traffic near the interchange of State Highway 62 and Interstate 35 West.  At the point before those two highways merge, two lanes on Highway 62 reduce to one, with a clearly marked shoulder in which it is not lawful to drive.  As is typical for that time of day, traffic along Highway 62 had slowed and become congested.

As the defendant drove along Highway 62 toward the interchange, he pulled across the solid white lane marker and onto the right shoulder of the highway.  He then drove illegally along the shoulder, passing other cars stuck in the rush-hour traffic.  As noted, the defendant's vehicle displayed no law-enforcement markings, lights, or sirens, and the defendant did not activate any such equipment as he drove.

---

[2] Unless otherwise noted, all facts are drawn from the Statement of Probable Cause appended to the Complaint, which is available at ECF No. 2.

A motorist ("Victim 1") and his front-seat passenger ("Victim 2") were driving in the line of cars along Highway 62.  There is no indication that Victims 1 and 2 are anything other than U.S. citizens and Minnesota residents.  The Victims saw the defendant driving "really, really fast" (ECF No. 2 at 3) along the shoulder.  Neither Victim was aware that the defendant's vehicle, or anyone in it, had any connection to immigration enforcement or the federal government.  Victim 1 twice briefly moved his car partially onto the shoulder to slow the defendant down and prevent the defendant's efforts to jump the traffic queue.  Both times, Victim 1 returned to the traffic lane.

At that point, the defendant did not simply pass Victim 1's car or pull into the traffic lane behind it.  Instead, the defendant pulled alongside the Victims.  He then rolled down his window and pointed a black Glock 19 handgun with a laser light at Victims 1 and 2.  In a later statement to investigators, the defendant claimed that while brandishing his firearm, he yelled "Police" or "Police, stop."  These words were not audible to the Victims, as the windows of their car were closed and, according to Victim 1, the defendant was simply wearing a black t-shirt that gave no indication he was a member of the police or a federal officer.  Victim 1 immediately called 911, fearful for his and Victim 2's safety and concerned that the defendant was a "crazy person driving down the road aiming guns at people."  ECF No. 2. at 4.

After merging into the traffic lane directly in front of Victim 1, the defendant continued to the Whipple Building.  He made no arrests, did not pursue any charges or citations against either Victim, and did not report the incident.

### B.  Defendant's Factual Claims

The defendant's removal notice (ECF No. 1 at 2–9) paints a very different picture of these events and what he considers to be relevant to the removal question.  But the defendant's putative factual claims suffer two critical shortcomings.  First, much of the defendant's "background"

invokes extraneous factual claims with no relevance to the questions before this Court. Second, in setting out those claims and his account of the incident that led to criminal charges, the defendant declines to cite any sources or offer any affidavits, declarations, or other factual support.

The defendant's depiction of the "frenzy" and "hostility" (*id.* at 4, 5) that ICE agents faced in Minneapolis in late 2025 and early 2026 is—in addition to being of dubious accuracy—not pertinent to the removal issue here. As noted above and described in more detail below, the central questions in this case are whether the defendant can establish (1) that his conduct on February 5, 2026, which forms the basis of the assault charges, has a causal connection to his federal immigration duties, and (2) a colorable federal defense. Those questions focus narrowly on the defendant's actions in this case, not on what was (or was not) happening elsewhere in the Twin Cities area over a time span that predates the defendant's arrival in Minneapolis shortly before the incident giving rise to this case.[3] Even if the defendant were correct that he was operating in a challenging environment, including facing "hostile people" earlier in the day on February 5, 2026 (*id.* at 5), those circumstances did not give the defendant carte blanche to assault anyone he subjectively deemed to be a threat, perhaps on the theory that everyday citizens "suspect[ed]" him of operating an "undercover ICE vehicle[]," *id.* at 6. And those circumstances do not bear on whether the defendant's authority as a federal immigration agent extends to aggressively menacing citizens with a gun while driving in an unmarked rental car.

A second flaw with the defendant's recitation of what he views as relevant context and events is his omission of any support for those claims. His portrayal of the streets of Minneapolis,

---

[3] The defendant gives two different dates for his arrival in Minneapolis. *Compare* ECF No. 1 at 3 (claiming he was detailed from Washington, D.C. to the Twin Cities metro area in February 2026), *with id.* at 4 (referring to his arrival in "late January[] 2026"). In either case, the defendant arrived after many of the events to which he alludes, including the federal-officer shootings in January 2026 and shortly before the February 5 incident at issue in this case.

for example, does not draw from any sources.  The same is true for his account of the events leading up to and during the incident on February 5, 2026.  Worse yet, his removal notice appears to claim that, immediately preceding the incident in question, he and his colleagues were ordered to "extract from the neighborhood" where they had been working, return to the Minnesota Air Force Reserve base that neighbors the Whipple Building, and "get further instructions and *continue their work*."  *Id.* at 5 (emphasis added).  That claim flatly contradicts what the defendant and his passenger said when interviewed about the incident—namely, that they were on the way back to base to end their workday.  ECF No. 2 at 3.

Shorn of its irrelevant and unsupported factual claims, the defendant's removal notice does not suffice to warrant removal.  If the Court does not summarily remand the case to state court, it should require the defendant at an evidentiary hearing to adduce facts beyond the *ipse dixit* account in his notice.

### C.  Procedural History

On April 16, 2026, the Hennepin County Attorney's Office charged the defendant with two counts of second-degree assault with a dangerous weapon.  The defendant made his first appearance on the charges on May 21, 2026.  On June 9, 2026, he filed a notice of removal under 28 U.S.C. §§ 1442 and 1455.  ECF No. 1 at 1.

## II.    LEGAL STANDARD

"[T]he regulation of crime" in our federal system "is pre-eminently a matter for the States." *Mesa*, 489 U.S. at 138 (quoting *Arizona v. Manypenny*, 451 U.S. 232, 243 (1981)); *see id.* ("[I]t goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government.").  This "traditional state authority" to investigate and prosecute "local criminal activity," *Bond v. United States*, 572 U.S. 844, 858 (2014) (quoting

*United States v. Morrison*, 529 U.S. 598, 618 (2000)), contributes to a "compelling state interest in conducting criminal trials in the state courts," *Morgan*, 395 U.S. at 409 n.4.  Accordingly, the Supreme Court has "identified a strong judicial policy against federal interference with state criminal proceedings."  *Mesa*, 489 U.S. at 138 (quoting *Manypenny*, 451 U.S. at 243).

Against this backdrop, the federal-officer removal statute, 28 U.S.C. § 1442, permits removal of a state prosecution of a federal officer to federal court only where the defendant establishes that: (1) he is a federal officer; (2) the conduct charged is for "any act done under color of [his federal] office," *id.* § 1442(a)(1); and (3) he can assert a colorable federal defense, *Mesa*, 489 U.S. at 139.  On the second prong, a defendant must demonstrate a "causal connection" between the conduct and his official federal authority.  *Minnesota by Ellison v. Am. Petroleum Inst.*, 63 F.4th 703, 715 (8th Cir. 2023); *Buljic v. Tyson Foods, Inc.*, 22 F.4th 730, 738 (8th Cir. 2021).  A federal-officer defendant also may show he was acting under color of his office by demonstrating that he protected an individual in his presence from "a crime of violence" or "provided immediate assistance to an individual who suffered, or who was threatened with, bodily harm."  28 U.S.C. § 1442(c).  On the third prong, for a defendant's asserted federal defense to be sufficiently "colorable" to justify removal, it must be "plausible."  *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001).  Only where a defendant has established all three prongs does a federal court have jurisdiction to preside over a state prosecution.  *Am. Petroleum Inst.*, 63 F.4th at 714; *Mesa*, 489 U.S. at 136.

It is the defendant's burden to establish that removal is warranted.  *In re Prempro Prods. Liab. Litig.*, 591 F.3d 613, 620 (8th Cir. 2010) ("The [removing] defendant bears the burden of establishing federal jurisdiction by a preponderance of the evidence.").  The defendant thus "must allege the underlying facts supporting each of the requirements for removal jurisdiction."  *Leite v.*

*Crane Co.*, 749 F.3d 1117, 1122 (9th Cir. 2014). Removal is not warranted based on a defendant's self-serving conclusions alone, and a court need not accept allegations that are wholly unsupported. *See Georgia v. Clark*, 23-cv-3721, 2023 WL 7012663, at \*5 (N.D. Ga. Sept. 29, 2023), *aff'd on other grounds*, 119 F.4th 1304 (11th Cir. 2024).[4]

Indeed, where "the non-removing party appropriately challenges the facts as set forth in the notice of removal," the defendant "must support [his] factual averments by competent proof." *New York v. Trump*, 683 F. Supp. 3d 334, 343 (S.D.N.Y. 2023) (cleaned up). If the federal district court does not summarily remand a case based on a facial deficiency in the notice, 28 U.S.C. § 1455(b)(4), it must order an evidentiary hearing on the question of removal "to be held promptly," and then "make such disposition of the prosecution as justice shall require." *id.* at § 1455(b)(5).

## III.   ARGUMENT

The State of Minnesota has charged the defendant for threatening another motorist out of road rage. For two independent reasons, this matter belongs in Minnesota state court. First, the defendant cannot show he is charged for an act taken under color of his federal office, as he fails to assert any meaningful causal connection between his conduct—his decision to brandish a firearm at two motorists while driving back to base—and his official federal authority.[5] Second, the defendant also cannot assert any plausible federal defense for rolling down his window and

---

[4] Citing *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999), the defendant argues (ECF No. 1 at 10) that this Court must "credit" his "theory of the case" for removal purposes. But that argument is doubly flawed. First, in *Acker*, the Supreme Court credited the defendant's theory only to avoid "decid[ing] the merits of [that] case." 527 U.S. at 432. Second, a defendant must still support any "theory of the case" he offers with a "detailed showing," *Morgan*, 395 U.S. at 409 n.4, which the defendant here has failed to provide.

[5] The State does not dispute that the defendant is a federal officer and thus that he has satisfied the first prong of the removal test.

threatening motorists who posed no imminent threat with a Glock 19 handgun—conduct that was unwarranted and plainly unreasonable under the circumstances. If the Court does not summarily remand this case based on these deficiencies in the defendant's notice, it should promptly hold an evidentiary hearing requiring the defendant to support his claims with "competent proof." *Trump*, 683 F. Supp. 3d at 343.

### A. Defendant Morgan was not acting under color of federal office

As an initial matter, "[n]ot every act of . . . a federal officer is an act under color of office." *Id.* at 345. Even if on duty at the time of the charged conduct—and thus able to avail himself of his service weapon, uniform, or other federal equipment—the defendant must show a causal connection between the conduct and his federal authority. *Minnesota v. Weber*, 589 F. Supp. 2d 1170, 1173 (D. Minn. 2008) ("[I]t is not enough for a federal employee to simply allege that at the time of the incident she was 'on duty and acting in the course and scope of her federal employment.'" (cleaned up)); *see also Colorado v. Symes*, 286 U.S. 510, 519–20 (1932) (denying removal of state homicide case even where defendant officer originally encountered victim while investigating federal prohibition violations); *Georgia v. Meadows*, 88 F.4th 1331, 1347–48 (11th Cir. 2023) (finding state's election-interference charges concerned conduct unrelated to defendant's federal duties, even when undertaken while defendant was on duty as President's chief of staff and at his place of employment). Indeed, "to justify so exceptional a procedure" as removal of a state case to federal court, the defendant must be "candid" and "specific" in "showing that his relation to [the charged conduct] was confined to his acts as an officer." *Maryland v. Soper*, 270 U.S. 9, 35 (1926).

The defendant's act of road rage does not "relat[e] to any act under color" of his federal immigration enforcement authority. 28 U.S.C. § 1442(a)(1). Indeed, the defendant makes no

9

meaningful effort to explain how his conduct amounted to "an act done under color of [his] office as [an] *immigration officer*[]." *Fink v. Gerrish*, 149 F. Supp. 915, 917 (S.D.N.Y. 1957) (emphasis added). As an ICE ERO officer, the defendant's authority principally governs the identification, arrest, detention, and removal of noncitizens for violations of U.S. immigration laws. *Enforcement and Removal Operations*, U.S. Customs and Immigration Enforcement, https://www.ice.gov/ero [https://perma.cc/A38K-A49H] (last visited June 16, 2026). Although federal law provides agents with some additional law enforcement authority, the scope of that power is limited. ICE agents may make arrests for federal criminal offenses committed in their presence or for federal criminal felony offenses, for instance, but only if the agents are engaged in immigration enforcement at the time of the offense and the arrestee would likely escape before a warrant could be obtained. 8 U.S.C. § 1357(a)(5); *see also* 8 C.F.R. § 287.5(c). ICE ERO agents are further instructed that they may conduct vehicle stops "only when [they] have reasonable suspicion that any occupant of the vehicle is unlawfully in the United States," and that they cannot stop vehicles "based on local traffic laws." U.S. Immigration and Customs Enforcement, Office of the Principal Legal Advisor, *Fourth Amendment Refresher Training*, at 79 (July 2025) (Ex. A).

None of these immigration authorities remotely applies to the defendant's conduct in pointing a gun at the Victims while driving on the highway. The defendant does not contend (and nothing in the record would support the claim) that his assault on the Victims was part of any immigration enforcement operation. He does not (and could not) plausibly assert that he reasonably believed either Victim was unlawfully present in the United States. At most, the Victims' actions amounted to a possible local traffic infraction—prompted by the defendant's own illegal driving—that the defendant had no authority to address.

10

Nor does the defendant's primary assertion (ECF No. 1 at 13)—that at the time of the incident he was "executing a direct supervisory order under official duties" to leave an enforcement site and "safe[ly] regroup" at a designated location—supply the requisite causal connection to his federal authority. Just as a federal officer's "mere performance of his duty to drive from one place of business to another place of business [is] not an act done under color of office," *Galbert v. Shivley*, 186 F. Supp. 150, 153 (W.D. Ark. 1960), neither does that drive convert every occurrence along the way into an act under federal authority. *See Naas v. Mitchell*, 233 F. Supp. 414, 416–17 (D. Md. 1964) (denying removal to federal court of negligent driving lawsuit against military officer who was on duty and driving to refuel his government vehicle because the act did not "bear a causal relationship" to the defendant's official duties and thus was not taken under "color of office"); *see also Weber*, 589 F. Supp. 2d at 1175 (noting lack of evidence that careless driving charges against U.S. Border Patrol agent over fatal traffic accident "touche[d] on core responsibilities of the federal government, or critical federal interests," and remanding to state court).

Despite the defendant's efforts to attach a veneer of federal authority to his conduct, he proffers nothing about his purported "supervisory order under official duties" to "extract" from the location of the enforcement action and to "protect each other" (ECF No. 1 at 13), that would transform it from a simple directive to leave the enforcement site into the authority to brandish a gun at motorists while driving back to base. The defendant cites no ICE policies or standard operating procedures that would render any and all conduct *after* leaving the scene of an enforcement action into an exercise of official federal duties. And he does not contend that he continued to engage in the prior enforcement operation or that he was conducting any new enforcement actions at the time of the incident. Indeed, in his account to investigators on the day

11

after the incident, the defendant clearly stated what he now tries to elide: that he was driving to the Whipple Federal Building simply to get gas and conclude his shift, having taken part in an immigration surveillance operation earlier in the day.  ECF No. 2 at 3.  The defendant's passenger acknowledged the same, describing that they were traveling "back to base, last call."  *Id.*  The agents were not, and did not claim to be, engaged in any enforcement operation or responding to a call for assistance or an emergency.[6]  There is no evidence of any job-related circumstance requiring the defendant to rush to his destination or to drive on the highway shoulder to get there.  Rather, the record before the Court shows that it was the defendant's decision to drive illegally on the shoulder to avoid the inconvenience of rush-hour traffic, and to draw and point his firearm at motorists who got in his way—choices that bear no connection to the defendant's federal authority.

In a single sentence (ECF No. 1 at 13), the defendant purports to invoke 28 U.S.C. § 1442(c), which Congress added in 2013 "to delineate specific circumstances where law enforcement officers are deemed to be acting under the color of their office for removal purposes." *Georgia v. Heinze*, 637 F. Supp. 3d 1316, 1324 (N.D. Ga. 2022).  As relevant here, the defendant claims that he was acting under color of his office because he was protecting himself and his ICE partner from a "crime of violence" and against "bodily harm."  *See* § 1442(c)(1) and (2).  But that claim is as far-fetched as it is underdeveloped.  A "crime of violence" under § 1442(c) refers to "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another."  *See* § 1442(d)(2) (cross referencing the definition of

---

[6] The defendant's and his partner's statements a day after the incident undermine the defendant's claim (ECF No. 1 at 5) in the removal notice that he expected to "regroup" and to "get further instructions" and "continue their work."

"crime of violence" provided in 18 U.S.C. § 16).[7] The defendant fails to identify any plausible offense the Victims committed by briefly trying to partially block and slow the defendant as he unlawfully rushed down the shoulder—let alone an offense that involves, as an element, "physical force against the person or property of another." For similar reasons, the notion that the defendant was threatened with "bodily harm" by having to slow down because another vehicle sought to prevent his unlawful driving cannot withstand scrutiny. The defendant's unreasonable "fear[] for his safety, the safety of his partner in the vehicle, and others on the road" (ECF No. 1 at 6), does not create the threat of bodily harm out of a brief traffic encounter.

In sum, neither the defendant's federal immigration duties nor the specified circumstances identified in § 1442(c) permitted the defendant to point his firearm at the Victims. He has therefore not satisfied the removal requirement that he acted under color of federal office, and the Court can remand this case on that basis alone.

### B. The defendant has not asserted a colorable federal defense

Removal is inappropriate here for a second reason: the defendant does not assert a colorable federal defense. Although he gestures at various defenses that he says "implicate[] federal law," he does not expound upon those defenses, ground them in federal law, or explain why they are "colorable" in this case. *See* ECF No. 1 at 8 (listing without citation "official duty self-defense," "official duty defense of another," "applicable ICE Use of Force policy," and "official duty necessity"). Instead, the defendant focuses solely on arguing that he may claim immunity under the Supremacy Clause of the U.S. Constitution. *Id.* at 13–14.

---

[7] The language quoted above comes from the first of two subsections of 18 U.S.C. § 16, as the Supreme Court has held the second subsection unconstitutionally vague. *See Sessions v. Dimaya*, 584 U.S. 148, 161–62 (2018).

But "[f]ederal officers and employees are not, merely because they are such, granted immunity from prosecution in state courts for crimes against state law." *Symes*, 286 U.S. at 518. To make out a valid Supremacy Clause immunity defense, the defendant must show *both* that he was performing "an act which he was authorized to do by the law of the United States" and that in performing that duty, he "did no more than what was necessary and proper for him to do." *In re Neagle*, 135 U.S. 1, 75 (1890); *Kentucky v. Long*, 837 F.2d 727, 744 (6th Cir. 1988). The defendant fails to meet each prong.

### i. Authorized by law

First, for the reasons that he cannot establish that he was acting under color of his federal authority, *see supra* at 9-13, the defendant cannot plausibly claim that the charged conduct falls within the scope of that federal authority. Although the defendant notes (ECF No. 1 at 14) that as an ICE ERO agent he had the authority to carry out surveillance and enforcement operations in the Twin Cities Area and to move from neighborhood to neighborhood in doing so, any such authority did not encompass a general power to patrol the streets and engage with motorists over traffic violations or poor driving. *Enforcement and Removal Operations* (describing the limited nature of ICE enforcement authority); 8 U.S.C. § 1357(a)(5) (same); 8 C.F.R. § 287.5(c) (same). Similarly, though the defendant claims (ECF No. 1 at 15) the uncontested authority "to carry and display his service weapon" and to ensure his and others' safety, such authority does not convert menacing motorists on the highway by pointing his service weapon at them into an exercise of federal authority. Put simply, the defendant's federal immigration enforcement authorities are not so expansive as to empower him to violate traffic laws for his convenience or to threaten other motorists simply because he views them as hostile combatants.

14

### ii. Necessary and proper

Second, the defendant fails to advance a colorable claim that he "did no more than what was necessary and proper for him to do." *In re Neagle*, 135 U.S. at 75. To merit the protections of Supremacy Clause immunity, the defendant must do more than "merely recit[e] the magic words 'necessary and proper'"; he must instead come forward with "underlying facts" that "make out a colorable federal defense." *Ivory*, 906 F.2d at 1001 n.4. But the defendant's *ipse dixit* account alleges largely irrelevant facts and is insufficient to show it was reasonable or necessary for him to pull alongside the Victims' car, roll down his window, and point a gun at the Victims—rather than simply drive around or merge back into the queue behind them. *See Wyoming v. Livingston*, 443 F.3d 1211, 1220 (10th Cir. 2006) (discussing cases interpreting "necessary and proper" prong of Supremacy Clause immunity test to be asking whether the conduct was "necessary and justifiable" or "reasonable and necessary").

The defendant contends (ECF No. 1 at 16–17) that he thought himself justified in pulling a gun on other highway motorists because of earlier unrelated events that day, a directive to return to base, and his belief that the Victims provoked the incident (and that ICE bore partial responsibility by providing only an unmarked rental car). He further claims (*id.* at 17–18) that those beliefs were objectively reasonable, owing to the purported "direct supervisory order to extract from an active operational area" referred to above and to the fact he was in an unmarked rental car.

These assertions do not support the claimed Supremacy Clause immunity defense. Some are plainly unreasonable, even if taking the defendant's implausible version of events at face value. *Cf. Graham v. Connor*, 490 U.S. 386, 397 (1989) (under the Fourth Amendment, an officer's use of force must "'objectively reasonable' in light of the facts and circumstances confronting" the

15

officer).  For example, the defendant claims (ECF No. 1 at 18) that "displaying" his firearm was his only "available method to deter an imminent vehicular threat and communicate lawful authority."  That claim ignores that the Victims did not pull partially into the highway shoulder unprompted; rather, they were predictably provoked by the defendant's decision to drive illegally on the shoulder in order to bypass queueing motorists.  The claim also neglects to explain why the defendant needed to violate traffic laws and drive on the shoulder in the first place, and why, to the extent he had a legitimate reason to identify himself as a federal immigration agent to the Victims, he could not have displayed a badge instead of a gun.  Brandishing a firearm instead understandably led Victim 1 to call 911 with the concern that the defendant was "a crazy person driving down road aiming guns at people."  ECF No. 2 at 4.  Nor does the defendant, who as an ICE agent did not have law enforcement powers possessed by state or federal peace officers, offer a plausible explanation for why he would have yelled to the victims that he was a member of the "Police."  ECF No. 1 at 18.  Indeed, the defendant took these actions—rolling down his window and pointing his gun at the Victims—*after* the Victims had pulled fully back into their lane and the purported "aggressive" driving the defendant claims to have feared had ended.  And it is undisputed that, despite the defendant's claims that he perceived the Victims' driving as such acts of "targeted hostility" that he drew his firearm (*id.* at 16–17), the defendant did not call for backup, attempt to stop or arrest the Victims, or even report the incident upon his return to base.  Thus, even under the defendant's telling, his conduct was not reasonable or necessary to carry out any federal immigration enforcement duty and cannot support his claimed immunity defense.

In addition, and as the defendant recognizes (*id.* at 19–20), courts in comparable cases involving state charges based on traffic-related incidents have routinely required officers invoking Supremacy Clause immunity to adduce facts showing that the charged conduct arose out of an

16

enforcement action or work-related emergency. *See Weber*, 589 F. Supp. 2d at 1174 (citing cases). In *North Carolina v. Cisneros*, 947 F.2d 1135 (4th Cir. 1991), for instance, the Fourth Circuit considered federal removal jurisdiction over state vehicular homicide and traffic charges against a military officer. The charges, for which the officer sought removal and invoked Supremacy Clause immunity, stemmed from a fatal traffic accident caused by the defendant officer, who was on active duty driving in a military convoy at the time. *Id.* at 1138. The Fourth Circuit held that to support the immunity defense, and thus establish federal removal jurisdiction, the officer had to "show that the accident resulted from an exigency or emergency related to his federal duties which dictated or constrained the way in which he was required to, or could, carry out those duties." *Id.* at 1139. Key to that holding was that the *exigency itself* had to constrain the way the officer was able to carry out his duties. The officer's failure to offer facts "reveal[ing] any such legitimately constraining duty-related emergency or exigency as the cause of state law violation" was thus fatal to his assertion of a colorable federal immunity defense, and the court ordered the case remanded to state court. *Id.* at 1140–41. In *North Carolina v. Ivory*, 906 F.2d 999 (4th Cir. 1990), the Fourth Circuit, considering a fatal traffic accident caused by a military officer while he was driving back to his base, disagreed with the officer's assertion that "the mere presence of a driver in a military convoy automatically gives rise to a colorable claim of immunity from local traffic laws." *Id.* at 1003. *See also Mesa*, 489 U.S. at 124, 138–39 (affirming order to remand prosecution of U.S. Postal Service drivers charged with state crimes for traffic accidents while they were on duty delivering mail, noting no indication of a colorable federal immunity claim or other federal defense).

Similarly, in *Weber*, a court in this District denied removal of criminal proceedings against a U.S. Border Patrol agent who fatally struck a pedestrian with her vehicle. 589 F. Supp. 2d at

1171–72.  The agent, whose duties included investigating crimes along the U.S.-Canada border in northern Minnesota, had hit a pedestrian trying to remove a downed tree from the roadway while the agent was on duty patrolling that road.  The court remanded to state court after concluding that the agent's invocation of Supremacy Clause immunity did not present a colorable federal defense because the record did not show an "exigency or emergency" related to the agent's federal duties.  *Id.* at 1174–75.  The same result is merited here.

The defendant attempts to distinguish these cases (ECF No. 1 at 19–20) by claiming that, unlike the officer in *Weber*, he did face exigent circumstances—in the form of his purported extraction order and the limited law-enforcement equipment in his rental car.  But while the defendant claims this exigency "is documented in the record" (*id.* at 20), that "record" consists entirely of his own unsupported claims.  And even there, the defendant does not allege any time pressures or time-sensitive demands that required him to rush to base by driving illegally on the shoulder of the highway—let alone pull alongside the Victims and point his gun at them.  To the extent the defendant's claimed exigency arose when the Victims momentarily pulled onto the highway shoulder in front of him (*id.* at 20–21), that did not constrain the defendant's ability to carry out any immigration enforcement duties and does not account for his decision to point a gun at the Victims *after* they had pulled back into their traffic lane.

The defendant would also have this Court ignore *Cisneros*, *Ivory*, and *Weber* on the grounds that they did not involve the exact circumstances he alleges in this case—namely, that he was "an agent executing a supervisory tactical withdrawal" in an unmarked rental car and was responding to what he says was a "targeted hostile act."  ECF No. 1 at 20.  He points instead to two cases granting removal that involved federal officers charged for their conduct while conducting surveillance.  *Id.* (citing *California v. Dotson*, 12-cr-917, 2012 WL 1904467, at *1

(S.D. Cal. May 25, 2012), and *Oregon v. Landis*, 23-cr-330 (D. Or. 2023)). But those cases are distinguishable because, unlike the defendant here, the officers there were involved in *active* enforcement operations when they committed the charged conduct. In *Dotson*, for instance, an ICE agent was participating in the nighttime vehicular surveillance of a suspected drug trafficker who had just crossed the border from Mexico. 2012 WL 1904467, at *1. After losing sight of his suspect and other members of the surveillance team, the officer started speeding to catch up with them. While speeding, he ran a stop sign and caused a fatal crash, prompting state manslaughter charges. *Id.* On the officer's motion to dismiss the charges based on Supremacy Clause immunity, the district court found that the facts satisfied the necessary-and-proper prong, citing the exigency of needing to provide law enforcement backup during ongoing nighttime surveillance. *Id.* at *4.

*Oregon v. Landis*—in which the federal district court issued no written opinion explaining its reasons for granting removal—similarly involved a Drug Enforcement Administration agent who, while actively conducting a surveillance operation and following a suspected target in his car, ran a stop sign and fatally struck a cyclist. The agent was charged with a state homicide offense. *Oregon v. Landis*, No. 25-447, 2025 WL 3553731, at *1 (9th Cir. Dec. 11, 2025). The court later granted the agent's motion to dismiss the charge on Supremacy Clause immunity grounds, but in doing so emphasized evidence that, to successfully conduct the ongoing surveillance operation, it was critical for the agent to remain with his surveillance team during the operation and reasonable for him to run a stop sign to do so. *See id.* at *2 (affirming district court order).

The defendant's effort to stretch the facts of this case to fit those cases falls flat. Any order to withdraw from an active operation and return to base—even with a purported directive to do so safely (ECF No. 1 at 22)—does not transform that drive back to base into an "active enforcement

19

operation[]" (*id.* at 21) of its own.  The defendant and his passenger acknowledged as much in their statements to investigators, describing the drive back as part of wrapping up their day—a "last call" (ECF No. 2 at 3) that had nothing to do with any active enforcement effort.

The defendant's various arguments on the necessary-and-proper prong rest on the same groundless allegations that, even if accepted as true, are insufficient to support a colorable Supremacy Clause immunity defense.  The defendant claims (ECF No. 1 at 16–18) that earlier unrelated events, an extraction order from a supervisor, and the limitations of his rental car both led him to believe he was justified in pointing his firearm at the Victims *and* somehow made that belief objectively reasonable.  And he provides no specifics to back up his conclusion (*id.* at 22) that his conduct "was in accordance with ICE Use of Force policy" and was a "valid" defensive act—identifying no language in any policies, plans, or regulations that direct or allow ICE agents to threaten the use of their firearm by pointing it at passing motorists, particularly on a busy highway.  At bottom, none of the defendant's contentions even begins to show why it was necessary or reasonable for him to point a Glock 19 handgun at two motorists on a busy highway after they had pulled fully back into their lane, and he further provides no factual backing for those claims other than his own say-so.  The defendant's allegations, even if implausibly taken at face value, fall far short of providing the detailed factual showing necessary to merit the exceptional step of removing a state criminal law prosecution to federal court.  *Morgan*, 395 U.S. at 409 n.4.

## IV.    CONCLUSION

The unsupported claims in the defendant's notice do not support removal.  The defendant has neither established that the charged conduct in this case was for an act taken under color of his federal office nor presented a colorable federal defense.  The Court therefore should remand this

20

prosecution to the district court for Hennepin County. To the extent the Court does not order summary remand, it should promptly hold an evidentiary hearing and then remand the case.


Dated: June 17, 2026                                    Respectfully Submitted,

                                                        MARY F. MORIARTY
                                                        Hennepin County Attorney

                                                        /s/ *Morgan D. Kunz*
                                                        MORGAN D. KUNZ
                                                        JOSHUA R. LARSON
                                                        HENNEPIN COUNTY ATTORNEY'S OFFICE
                                                        300 S. 6th St.
                                                        Minneapolis, MN 55487
                                                        (612) 348-5550
                                                        Morgan.Kunz@hennepin.us
                                                        Joshua.Larson@hennepin.us

                                                        /s/ *Julia Gegenheimer*
                                                        JULIA GEGENHEIMER* (D.C. Bar No. 90034692)
                                                        INSTITUTE FOR CONSTITUTIONAL ADVOCACY
                                                           AND PROTECTION
                                                        Georgetown University Law Center
                                                        600 New Jersey Ave. NW
                                                        Washington, D.C. 20001
                                                        (202) 661-6539
                                                        jg1370@georgetown.edu

                                                        /s/ *James I. Pearce*
                                                        JAMES I. PEARCE* (D.C. Bar No. 90042280)
                                                        WASHINGTON LITIGATION GROUP
                                                        1717 K Street NW
                                                        Washington, DC 20006
                                                        (202) 521-8750
                                                        jpearce@washingtonlitigationgroup.org

                                                        *Counsel for State of Minnesota*

 * *Pro hac vice application forthcoming*


21

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2026, a true and accurate copy of the State of Minnesota's

Opposition to Defendant's Notice of Removal was filed electronically with the Court's CM/ECF

filing system, which will then send notification of such filing to the parties, including:


RYAN M. PACYGA
Ryan Pacyga Criminal Defense
860 Blue Gentian Road
Suite 175
Eagan, MN 55121
612-339-5844
ryan@arrestedmn.com

*Attorney for Defendant*


This 17th day of June, 2026.


/s/ *Morgan D. Kunz*
MORGAN D. KUNZ
HENNEPIN COUNTY ATTORNEY'S OFFICE
300 S. 6th St.
Minneapolis, MN 55487
(612) 348-5550
Morgan.Kunz@hennepin.us

22