**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| State of Minnesota,<br><br>Plaintiff,<br><br>v.<br><br>Gregory Donnell Morgan, Jr.,<br><br>Defendant. | Case No. 26-CR-112 (NEB)<br><br>**DEFENDANT'S MEMORANDUM IN SUPPORT OF REMOVAL** |

## INTRODUCTION

This is a case about the supremacy of federal law. The Constitution settled that question long ago. Agent Gregory Donnell Morgan Jr., a federal officer, faces state criminal charges less for what he allegedly did than for what he symbolizes. He is a pawn in a political fight over federal immigration enforcement.

Congress saw this coming. In the wake of another rebellion against lawful federal authority, it acted unambiguously. Federal officers may remove vindictive state prosecutions to federal court. *See* 28 U.S.C. § 1442.

Officer Morgan meets all three prongs of the statute Congress enacted for just this scenario. Each is satisfied with a colorable showing. **First,** Officer Morgan is a federal officer. That is undisputed. **Second,** his conduct was under color of that office and relates to it. Officer Morgan, his partner, and their team were detailed to Operation Metro Surge to carry out federal immigration enforcement, on TDY status, 24/7. He was on shift that day. His conduct arose from, and related to, that mission:

- He was following federal orders to extract from a hostile neighborhood and return to the Air Force Reserve base to continue enforcement duties.
- He was following federal orders to protect himself and his ICE partner at all times in a hostile environment.
- He was driving himself and his partner between neighborhoods and the base several times a day. The operations were fluid. They changed by the minute, and sometimes turned dangerous.

Then came the Cadillac. As Officer Morgan carried out those orders, the Cadillac swerved into their path. Twice. The second time, the driver brake-checked Officer Morgan and his partner on a busy highway and nearly caused a collision. The conduct was intentional. It amounted to felony second-degree assault under Minnesota law and felony interference with and assault of a federal officer under federal law.

After the second act, Officer Morgan knew he was being targeted. He reasonably feared for his safety, his partner's safety, and the safety of the commuters around them. He did what his training required. He established his federal presence, warned the driver verbally, and displayed his department-issued firearm. The situation de-escalated. He stood ready to defend himself and his partner if it did not.

The Cadillac driver created the exigency. It unfolded in seconds, in the middle of fluid immigration enforcement duties, and on top of the standing duty to protect his partner from hostile threats. Officer Morgan acted under color of his office. At a

minimum, his conduct was "related to" his federal duties. The second prong is satisfied.

**Third,** Officer Morgan has a colorable federal defense, including Supremacy Clause immunity, self-defense, and defense of others in the course of his federal duties.

To Hennepin County, this is not about justice; this is pure political theater. To Agent Morgan, this is his life, his career, and his solemn duty under the law. The truth matters, because "the government wins when justice is done." *See United States v. Dawkins*, 562 F.2d 567, 569 (8th Cir. 1977).

**FACTS**

As this Court has observed, the facts in this case are "not complex." *State v. Morgan*, No. 26-CR-112 (NEB) (D. Minn filed Aug. 24, 2026) (hereinafter D.E. 53), at 3.

Agent Gregory Donnell Morgan, Jr., is a federal law enforcement officer who began employment with the Immigration and Customs Enforcement Agency (ICE) on September 21, 2025. Hr'g Tr. at 301, (Volume II of II) before Judge Nancy E. Brasel, *State v. Morgan*, No. 26-CR-112 (D. Minn. Oct. 13, 2026) (hereinafter "D.E. 72"). He had previously worked in federal law enforcement at the Smithsonian Institution and the Department of Defense, but he enjoys working at ICE because it allows him to help immigrants, become engaged with vulnerable people, and build positive relationships with people who need help. D.E. 72, at 300-01. On a normal basis, Agent Morgan endeavors daily to aid at least 5,000 immigrants, predominantly individuals

unlawfully present in the United States, working to be processed through legal channels. D.E. 72, at 303. He prioritizes family reunification because "we all have family." D.E. 72, at 303. All of this is top of mind for a single father of a young daughter and the son of a cancer patient from a tight-knit family. D.E. 72, at 309.

Agent Morgan underwent federal officer training on use of force and defensive tactics, among other tests, at which he excelled. D.E. 72, at 304. He also understood his duties regarding following chain of command and obeying all orders from his superior officers. D.E. 72, at 307.

In January 2026, against his personal wishes, Agent Morgan was deployed to the Twin Cities from his base in the Washington D.C. Area. D.E. 72, at 308, 311. Despite asking multiple times, Agent Morgan was not permitted to bring to Minnesota his law enforcement vehicle, which was equipped with lights, sirens, loudspeaker, and other means to identify himself as a federal officer, during Operation Metro Surge. D.E. 72, at 309-310. Instead, Agent Morgan's designated partner in their team of eight, Agent Myles Codner, was ordered to rent a black Ford SUV, which bore out of state license plates. D.E. 72, at 310, 331. The rental vehicle contained no police equipment, which was "very challenging" for Agent Morgan. D.E. 72, at 311. Moreover, the external radio communications were "very bad." D.E. 72, at 325. Agent Morgan was designated as the vehicle driver. D.E. 72, at 322. As part of his official duties, Agent Morgan drove this vehicle between the Whipple Building, the local Air Force base, and various Twin Cities neighborhoods. D.E. 72, at 325-26.

From day one, Agent Morgan was warned of the treacherous conditions he

would face from hostile crowds in the Minneapolis and St. Paul metropolitan area. Colleagues told him to be "very careful;" warned him that people were stealing or vandalizing their equipment, including weapons; and alerted him that protestors would constantly harass him, including with racial slurs. D.E. 72, at 308. Agent Morgan was terrified by what he heard:

> They bust windows. And also threaten agents down here. A lot of hotels that they were staying at, they were like taking wheels off their car, busting their windows, taking pictures of their tags, their license plates, and banging on drums and stuff so you can't sleep at night following you. A lot of people told me they were like getting boxed in and racial slurs.

D.E. 72, at 308.

The truth proved stranger than fiction. Agent Morgan had "never seen something like that in policing . . . . it seemed like a riot almost down here, compared to … just protesting." D.E. 72, at 308. "You couldn't sleep. We didn't have time to think. This was all day, every second, people in your face treating you wrong like you [are] not human, because of an agency you work for. . . . The whole time I was here, I was concerned for my safety. . . . People think because we're law enforcement and got vest[s] on we're not human. I could die just like the next person." D.E. 72, at 329-30.

Civilians aimed projectiles at Agent Morgan and his colleagues, hit him with a rock, called him the "N" word, ran up to his car, threw dildos at him, and constantly threatened him. D.E. 72, at 309, 314-15. Civilians told him they would kill him. D.E. 72, at 328. He often found himself fleeing from different threatening civilian vehicles. D.E. 72, at 325.

Particularly in light of these circumstances on the ground, Agent Morgan was

ordered to protect himself, his partner, and his team at all times. His superiors did not sugarcoat the abysmal conditions:

> They immediately told us that it was … very dangerous down here, protect each other no matter what, under any circumstances protect each other. Don't let nothing happen to each other. . . . They said it was like almost like rioting down here, and they also said that local law enforcement was not helping us out.

D.E. 72, at 312.

Agent Morgan was on constant duty or "TDY" which is considered "24/7, around the clock." D.E. 72, at 312. He did have a regular shift from 12 noon to 8 p.m., which he sometimes exceeded, but he was considered on duty around the clock. D.E. 72, at 313. Agent Morgan had no option to reject TDY status. D.E. 72, at 313.

Mornings at the Whipple Building or the Air Force Reserve base would begin with Agent Morgan filling his vehicle's gas tank, joining his team in a circle to check each other's gear, hearing the daily assignment, and always, being instructed to protect each other. D.E. 72, at 322.

The events at issue in this case took place on Thursday, February 5, 2026. On that day, Agent Morgan was equipped with a gun belt, his ICE issued weapon, and his issued cloth field badge, which is not easily removable. D.E. 72, at 314. He could not manage that badge easily with his especially big hands, so oftentimes his coworkers helped him apply it securely; the whole process to affix his uniform badge could take five minutes. D.E. 72, at 319. His bulletproof vest was labeled "police" to identify himself as law enforcement. D.E. 72, at 317, 319. He had his metal badge containing his actual credentials locked up in a trunk for security reasons. D.E. 72,

at 317. He was on TDY status the whole day on February 5. D.E. 72, at 330. He never clocked out. D.E. 72, at 385.

This case arose when a driver started a traffic altercation with Agent Morgan on February 5. However, it was not the first such incident even that very day. One of Agent Morgan's duties was to assist other officers. D.E. 72, at 332. On February 5, he was summoned to help fellow officers in an emergency. D.E. 72, at 333. While driving to the location, the driver of a Jeep Cherokee repeatedly tried to block him to the point where Agent Morgan feared he might drive off the road. D.E. 72, at 333. So Agent Morgan shouted, "Police, back off." He also displayed his firearm. He followed his training, "and eventually it worked. He backed off." D.E. 72, at 333. The situation was de-escalated successfully when the civilian retreated. D.E. 72, at 334.

This case arose out of events later that day when Agent Morgan was yet again summoned to help an agent whose car was surrounded by civilians. D.E. 72, at 335-36. An angry protestor called Agent Morgan an "Uncle Tom" and said he would kill Agent Morgan while other protestors threw things at him. D.E. 72, at 336. Suddenly, the whole team received orders to extract from the hostile neighborhood. D.E. 72, at 336.

Unfortunately, Agent Morgan and Agent Codner were separated from their team at a traffic light while trying to drive back to base safely. D.E. 72, at 336. People were still following them in a chaotic scene. D.E. 72, at 338. In particular, Agent Morgan and Agent Codner were tailed by two Subarus, which they eventually appeared to lose, but they could not be certain. D.E. 71, at 65–66.

That was not the end of their difficulties, however. While fleeing back to base on duty and under orders to protect himself and his partner, Agent Morgan and his partner sitting behind him in the vehicle encountered a white Cadillac. The Cadillac swerved sharply ahead of his vehicle. D.E. 72, at 340, 342. Although the aggressive swerve made him suspicious, Agent Morgan was unsure initially of the Cadillac driver's intentions. D.E. 72, at 340. The Cadillac had black tinted windows, so he could not see anything inside. D.E. 72, at 341.

Almost immediately, the Cadillac swerved at Agent Morgan's vehicle again. Agent Morgan observed the brake lights illuminate on the Cadillac. D.E. 72, at 452.

Later, the Cadillac driver told police he "made the not so bright decision to try to stop" Agent Morgan. Def. Ex. 63, at 1. The Cadillac driver admitted he was trying to "cut him off" and "so that was my bad." Def. Ex. 61, at 2. The Cadillac driver never at any point asserted any fear from Agent Morgan's actions, but instead repeatedly verbalized profanity, anger, and threats in statements to police after his raw vigilante assault on Agent Morgan and Agent Codner. *See, e.g.*, Def. Ex. 59, at 1 ("Like F--- off I'm strapped too. Get the f--- out of here. God d---- people are so dumb."); Def. Ex. 61, at 8 ("It was just kind of embarrassing if anything to me."). He eventually acknowledged it "wasn't my place to, uh, to enforce, uh, not driving on the shoulder like that." Def. Ex. 63, at 5.

Agent Morgan now understood the vehicle was trying to block and assault him, and he believed the Cadillac may have been part of a hostile cavalcade following him. D.E. 72, at 343. Agent Morgan recounted, as a federal law enforcement agent, that

he had developed probable cause that the Cadillac was impeding his law enforcement duties. D.E. 72, at 364.

The second swerve was extremely dangerous. As Agent Morgan said, "the vehicle brake checked me and almost smashed into it. . . . I was like inches away. . . . My heart was racing. . . . These vehicles are very fast. . . . I could have hurt him. He could have hurt me. I didn't want nothing to happen to him at all." D.E. 72, at 343-44. He understood the Cadillac could be a deadly weapon. D.E. 72, at 357. "A vehicle is like a missile." D.E. 72, at 357.

Agent Morgan believed he was under attack by yet another hostile activist, so many of whom had been emboldened and called into service by anti-ICE politicians and organized community resistance. *See* Declaration of Andrew J. Gubash at ¶¶ 15, 19. Simply to identify himself as law enforcement and to de-escalate the situation, Agent Morgan brandished his service weapon for perhaps five seconds in the low-ready position and exclaimed, "Police, back up, back off!" with the window down partway. D.E. 72, at 344, 348-49, 351, 354.

Agent Morgan did not point his pistol at anyone. D.E. 72, at 352. To the contrary, he took a defensive posture despite the fact that the Cadillac presented an imminent danger to Agent Morgan, his partner, and other drivers. D.E. 72, at 365. He had been trained to use his firearm to display it, including to point it during a perceived threat, and to use it to gain control of a situation. D.E. 72, at 357, 452. No one was killed or injured. D.E. 72, at 359, 419. As Agent Morgan later realized, "I didn't choose that car. That car chose me." D.E. 72, at 346. Agent Morgan feared he

was under attack by a driver who committed the federal offense of assaulting a federal officer in the course of his duties, a violation of 18 U.S.C. § 111 (assaulting, resisting, or impeding certain officers or employees). D.E. 72, at 364. *See* 18 U.S.C. § 111. He testified the Cadillac driver was impeding him. D.E. 72, at 364.

As Agent Morgan observed in court, "I have never been in law enforcement where people chasing me." D.E. 72, at 421. "At that moment, I thought I was going to crash into the vehicle, and also I felt like it was an ambush . . . . It was like an imminent threat to me." D.E. 72, at 453. Notably, under ICE policy, as Agent Morgan's agency trainer John Parodi testified, the display of a weapon "goes up to officer presence. The display of a tool in itself, it is not an application of force according to our policy." D.E. 71, at 147.

Unbeknownst to him, Agent Morgan was driving on the shoulder of the road. But as he testified, "I didn't even know that it wasn't a lane. Where I'm from, shoulders are much smaller. This was a wide shoulder, and I'm fleeing from someone, you know." D.E. 72, at 345. The shoulder was actually as wide or wider than a traffic lane. D.E. 72, at 346.

At some point after this encounter, Agent Morgan then realized he was driving on the shoulder of the road. D.E. 72, at 355. Agent Morgan thereafter peacefully merged into traffic, but the Cadillac continued to follow him. D.E. 72, at 361. The Cadillac driver put up his middle finger in an obscene gesture towards Agent Morgan. D.E. 72, at 362. The driver told law enforcement later that he stayed on Agent Morgan's "tail", Def. Ex. 61, at 3, and boasted that "I'm carrying as well." *Id.* at 8. The

Cadillac driver guessed that Agent Morgan was with ICE. Ex. 63, at 4 and admitted that he "got the ICE vibe from him at first." *Id.* at 6. In short, at worst, the driver was an armed traffic vigilante who appears to have committed assault upon federal officers in the course of his duties. At best, the driver intended to impede federal officers Morgan and Codner in the course of their duties.

Thankfully, after Agent Morgan displayed his presence as a law enforcement officer, the Cadillac's behavior de-escalated. D.E. 72, at 365. Agent Morgan stayed within the scope of his training and acted under his federal authority. D.E. 72, at 366.

Agent Morgan rejoined his team at the Air Force Reserve base, and he continued operations for at least two and a half more hours. D.E. 72, at 362-64. Agent Morgan reported the attack on himself and his partner to his supervisor in both oral and written form. *Id.*

For his actions defending himself and his partner, Hennepin County Attorney Mary Moriarty charged Agent Morgan with two counts of second degree assault with a dangerous weapon in state court two months after the fact. The driver of the Cadillac was not charged with any crime.

## LEGAL STANDARD

28 U.S.C. § 1442 reads as follows:

> (a) A Civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> > (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right,

> title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.
>
> . . . .
>
> (c) Solely for purposes of determining the propriety of removal under subsection (a), a law enforcement officer, who is the defendant in a criminal prosecution, shall be deemed to have been acting under the color of his office if the officer—
>
> (1) protected an individual in the presence of the officer from a crime of violence;
>
> (2) provided immediate assistance to an individual who suffered, or who was threatened with, bodily harm;
>
> . . . .
>
> (d) In this section, the following definitions apply:
>
> (2) The term 'crime of violence' has the meaning given that term in section 16 of title 18;

## ARGUMENT

### I. Agent Morgan Well Exceeds the Low Threshold for Removal

#### A. The Statute is Broadly Construed.

One thing is manifestly clear from Supreme Court and Eighth Circuit precedent: "This removal statute should be liberally construed, and the typical presumption against removal does not apply." *Griffin ex rel. Plaintiff v. Optum, Inc.*, 175 F.4th 897, 901 (8th Cir. 2026) (internal citations omitted). *Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1230 (8th Cir. 2012) ("[T]he Supreme Court 'has made clear that the statute must be "liberally construed"'."). *See also Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007). (recognizing that the statute must be "liberally construed"). The highest court in the land has "looked to the statute's language, context, history, and purposes to inform the analysis regarding just how broadly the federal officer removal statute should be applied." *Jacks,* 701 F.3d at 1231.

In growing concern over historical state and local resistance to federal law enforcement, Congress has significantly broadened the scope of the statute, including as to who may remove a lawsuit and what must be alleged to remove a case. "Congress extended the statute to cover *all* federal officers when it passed the current provision as part of the Judicial Code of 1948." *Willingham v. Morgan*, 395 U.S. 402, 406 (1969) (emphasis added) (unrelated to client at bar). Additionally, Congress used the 2011 Removal Clarification Act §2(b), 125 Stat. 545, to lower the standard from a "strict causal relationship" to any "association with or connection with . . . . even if the connection is 'indirect,'". *See Chevron USA Inc. v. Plaquemines Par.*, 146 S.Ct. 1052, 1060 (2026) (internal citations omitted).

**B. The Standard is Low.**

As this Court has noted already, the bar Agent Morgan must clear at this stage is low, and his theory of the case prevails.

> At this stage, the Court's role is not to decide the defense's ultimate merits; the Court merely considers whether the defense is colorable. And for a defense to be considered colorable, it need only be plausible. In evaluating the propriety of removal, the Court must credit the defendants' theory of the case.

*State v. Morgan*, Case No. 26-CR-112 (NEB), Order, D.E. 53 (Aug. 24, 2026) (internal citations omitted).

### C. Agent Morgan Need Not Plead Overly Detailed Facts.

At this stage, Agent Morgan need only present rudimentary facts. "The removal statute itself merely serves to overcome the 'well-pleaded complaint' rule." *Mesa v. California*, 489 U.S. 121, 136 (1989).

## II. Agent Morgan Easily Meets the §1442 Three Prong Test

As this Court already held, the test to demonstrate that removal is proper is simple. Agent Morgan "must establish that (1) he is a federal officer; (2) the suit is 'for or relating to any act under color of such office'; and (3) Morgan has a colorable federal defense. 28 U.S.C. § 1442(a)(1)." D.E. 53, at 2. The question is one of jurisdiction rather than the merits of a claim or defense. D.E. 72, at 6; *see also BP p.l.c. v. Mayor of Balt.*, 593 U.S. 230 (2021) (Section 1442 is jurisdictional statute). As the moving party, Agent Morgan bears the burden of showing the propriety of federal removal. *Id.; see also Watson*, 420 F.3d at 855, *rev'd on other grounds*, 551 U.S. 142.

### A. Agent Morgan is a Federal Agent.

Agent Morgan is an employee of the United States. Specifically, he is a Removal Officer with U.S. Immigration and Customs Enforcement, a component of the Department of Homeland Security. *See* D.E. 72, Transcript of Evidentiary Hearing, Volume II of II, Direct Testimony of Agent Gregory Donnell Morgan, Jr., p. 301.

Hennepin County concedes Agent Morgan is a federal agent. See D.E. 8, State of Minnesota's Opposition to Defendant's Notice of Removal, p. 8 n.5.

Without contention, Agent Morgan easily meets the first prong of the test.

## B. Hennepin County Charged Agent Morgan "For or Relating to an Act Under Color of Federal Office."

### 1. The "For or Relating to" Standard is Lenient.

The fighting issue in this case at this stage is whether or not Agent Morgan was working under color of federal office. Agent Morgan easily meets the threshold necessary to remove his case as the definition of this second prong is expansive:

> The phrase 'relating to' sweeps broadly. It means 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.' One thing can relate to another even if the connection is 'indirect.' One thing can relate to another even if it was 'not specifically designed to affect' it. And, one thing can relate to another even without a 'strict causal relationship.' Accordingly, a removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct.

*Plaquemines Par.,* 146 S.Ct. at 1060 (internal citations omitted) (private oil company's efforts to produce wartime military product satisfied 1442 second prong).

Agent Morgan was only driving on the highway with his partner because of his role as a federal agent fleeing a dangerous neighborhood and en route back to a base of operations. His on duty status, on special assignment far from home, in uniform, driving a government authorized vehicle, transporting another federal officer, on the government payroll, and defensive actions when attacked by the Cadillac easily meet the test set out by § 1442's second prong. "It is enough that his acts or his presence at the place in performance of his official duty constitute the basis, though mistaken or false, of the state prosecution." *Mesa,* 489 U.S. at 132 (internal citations omitted).

### 2. It Matters Not that Agent Morgan Was Driving on the Road's Shoulder.

It is true that Agent Morgan unknowingly drove on the shoulder of the road during the encounter with the Cadillac. He has not been charged with any traffic violation, however. Moreover, no statute empowers citizens to "enforce" traffic laws against federal agents in the course of their duties by using their vehicles as moving blockades or dangerous weapons. More importantly, the course of Agent Morgan's driving has no bearing on the removal analysis. "The ordinary meaning of 'relating to' does not require the defendant to show that his federal duties specifically invited his challenged conduct." *Plaquemines Par.,* 146 S.Ct. at 1061. Indeed, it was the Cadillac who prompted Agent Morgan's challenged conduct. Critically, the law does not allow the Cadillac's intervention to break the nature of Agent Morgan's ongoing duty. "An act can relate to its consequences even when the causal chain includes actions by intermediaries." *Id.*

### 3. Supreme Court Caselaw Supports Removal of this Case.

The trio of leading Supreme Court cases, whose facts are remarkably parallel to the facts of this case, confirm that Agent Morgan was acting within the scope of his duties at the time he and his partner were assaulted and their duties impeded by the Cadillac. Interestingly, all three cases were decided either unanimously or with a supermajority of justices uniting behind a generous interpretation of the statute.

#### a. *In re Neagle*

In the leading and most comprehensive Supreme Court case on the subject of removal, the Court confirmed the history, text, and practical import of § 1442

comprehensively support removal in all but outlier situations in a case decided by a lopsided 7-2 vote.

In fact, this case is strikingly similar to the seminal case of *In re Neagle*, 135 U.S. 1 (1890), where a deputy U.S. marshal fired two shots to stop an attempt on the life of Associate U.S. Supreme Court Justice Stephen J. Field, almost instantly killing David Terry, the assailant. *Id.* at 3-4. Neagle was sitting at breakfast with Justice Field, who was traveling between court sessions in Los Angeles and San Francisco, when Neagle shouted for the assailant to stop and identified himself as law enforcement. *Id.* at 52-3. Ultimately, Neagle killed the assailant. *Id.* at 53.

As was Agent Morgan, Neagle was protecting himself and another federal officer between duty stations because they had a responsibility to travel, the Court found. *Id.* at 56. As was Agent Morgan, Neagle was assaulted and thereafter identified himself as law enforcement and displayed his weapon to stop the attack. *Id.* As with Agent Morgan, the state asserted Neagle had no "protection whatever against a vindictive or malicious assault growing out of the faithful discharge of his official duties." *Id.* at 58. This, the Supreme Court found, was simply beyond the pale:

> If we indulge in such impracticable views as these, and keep on refining and rerefining, we shall drive the national government out of the United States, and relegate it to the District of Columbia, or perhaps to some foreign soil. We shall bring it back to a condition of greater helplessness than that of the old confederation. . . . It must execute its powers, or it is no government. It must execute them on the land as well as on the sea, on things as well as on persons. And, to do this, it must necessarily have power to command obedience, preserve order, and keep the peace; and no person or power in this land has the right to resist or question its authority.

*Id.* at 61.

> We do not believe that the government of the United States is thus inefficient, or that its Constitution and laws have left the high officers of the government so defenceless [sic] and unprotected. . . . We hold it to be an incontrovertible principle, that the government of the United States may, by means of physical force, exercised through its official agents, execute on every foot of American soil the powers and functions that belong to it. This necessarily involves the power to command obedience to its laws, and hence the power to keep the peace to that extent.

*Id.* at 59-60. Ultimately, the Court found Neagle was "authorized to resist the attack of Terry upon him … he was acting under the authority of the law of the United States … and that he is not liable to answer in the courts of California on account." *Id.* at 76.

*Neagle* is the key to this case. Agent Morgan was authorized to resist the attack of the Cadillac under the authority vested in him by the United States. Ultimately, his fate should be determined in federal, not state court.

**b. *Willingham v. Morgan***

Indeed, the Supreme Court has reached the same outcome in cases where there was much *less* connection between the defendant's federal duties and the alleged offense. In *Willingham,* 395 U.S. 402, a unanimous decision from the Court, the complainant sought relief against the Leavenworth, Kansas United States Penitentiary prison warden and chief medical officer, whom he claimed tortured him while "acting 'on a frolic of their own which had no relevancy to their official duties as employees or officers of the United States.'" *Id.* at 407. Specifically, the federal prisoner claimed the warden and doctor "inoculated him with 'a deleterious foreign

substance' and had assaulted, beaten, and tortured him in various ways, to his great injury." *Id.* at 403. He sued for damages in state court. *Id.*

The United States Court of Appeals for the Tenth Circuit held that § 1442 "provides a rather limited basis for removal," and "the test for removal was 'much narrower' than the test for official immunity." *Id.* at 404-05.

Both holdings were error, ruled the Supreme Court, in a unanimous decision. *Id.* at 404. Instead, the Supreme Court held that "the federal officer removal statute is not 'narrow" or 'limited'." *Id.* at 406. "Congress has decided that federal officers, and indeed the Federal Government itself, require the protection of a federal forum. This policy should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." *Id.* at 407. Although the prisoner mocked the notion that torture could be part of any federal officer's duties, the Court was convinced by the reason for the interaction: "[W]e think it was sufficient for petitioners to have shown that their relationship to respondent derived solely from their official duties." *Id.* at 409.

> 'It is enough that [petitioners'] acts or [their] presence at the place in performance of [their] official duty constitute the basis, though mistaken or false, of the state prosecution.' In this case, once petitioners had shown that their only contact with respondent occurred inside the penitentiary, while they were performing their duties, we believe that they had demonstrated the required 'causal connection.' The connection consists, simply enough, of the undisputed fact that petitioners were on duty, at their place of federal employment, at all the relevant times. If the question raised is whether they were engaged in some kind of 'frolic of their own' in relation to respondent, then they should have the opportunity to present their version of the facts to a federal, not a state, court. This is exactly what the removal statute was designed to accomplish. Petitioners sufficiently put in issue the questions of official justification and immunity; the validity of their defenses should be determined in the federal courts.

*Id.*

The simple fact that Agent Morgan was "on duty" at all the relevant times, shows that his relationship with the assailants "derived solely from [his] official duties." *Id.* at 409. As with the warden and medical officer, whose "only contact with respondent occurred while they were executing their federal duties inside the penitentiary," *Id.* at 408, Agent Morgan's only contact with the Cadillac occurred while he was executing his federal duties in Minnesota, driving his work-authorized vehicle back to base during fluid immigration enforcement operations, where he would remain on shift and continue his federal duties.

**c. *Chevron USA Inc. v. Plaquemines Par.***

*Plaquemines Par.*, 146 S.Ct. 1052, which appears to be the Court's most recent pronouncement on § 1442, was another unanimous decision from the Supreme Court handed down just this year. The key issue in *Plaquemines Par.* was the standard implicated under prong two.

A state parish sued Chevron in state court for alleged environmental violations. The oil company removed the case to federal court. *Id.* at 1057. However, the federal district court remanded the action back to state court, and the U.S. Court of Appeals for the Fifth Circuit affirmed, questioning whether Chevron could show its oil production and refinement for the U.S. military, including during the Second World War, were "for or relating to its performance of federal duties." *Id.*

The Supreme Court reversed, holding the lower courts held the bar too high. "Chevron has plausibly alleged a close relationship between its challenged conduct

and the performance of its federal duties—not a tenuous, remote, or peripheral one." *Id.* at 1061.

Likewise here, Agent Morgan would not have been in Minnesota, let alone driving on a metro highway in his uniform and agency authorized vehicle with his partner in a backseat working on his laptop, but for his federal duties. He may not have been assaulted but for the Cadillac's suspicion of his "ICE vibes." D.E. 72, at 456–57. And he would not have displayed his weapon but for the fact that he and his team were extracting, under attack, and retreating to base to regroup and continue their immigration enforcement operations. Morgan has demonstrated a "close relationship" that is not "tenuous, remote, or peripheral" under *Plaquemines Par.*.

Together, these three cases, *Neagle*, *Willingham*, and *Plaquemines Par.*, covering over a century of Supreme Court caselaw from post-Reconstruction to the modern era, counsel a reading of the statute that favors federal removal as a matter of law, policy, and practice.

### C. Agent Morgan Asserts a Colorable Federal Defense.

#### 1. The Standard To Claim The Shelter Of The Third Prong Is Low.

Again and again, the Supreme Court has "rejected … narrow construction of the statute and held § 1442 'broad enough to cover all cases where federal officers can raise a colorable defense arising out of the duty to enforce federal law.'" *Osborn v. Haley*, 549 U.S. 225, 249 (2007). *See also Willingham,* 395 U.S. at 406–07 ("The federal officer removal statute is not 'narrow' or 'limited.' At the very least, it is broad enough to cover all cases where federal officers can raise a colorable defense arising

out of their duty to enforce federal law.") (internal citations omitted). The Supreme Court has instructed that "in construing the colorable federal defense requirement, we have rejected a 'narrow, grudging interpretation' of the statute, recognizing that 'one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court.' We therefore do not require the officer virtually to 'win his case before he can have it removed.'" *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999). See also *Jacks,* 701 F.3d at 1235 ("The officer need not win his case before he can have it removed.") Indeed, the court should not make a decision as to the actual merits of a defense. *Id.*

### 2. Agent Morgan Is Entitled To Have His Defenses Heard In Federal Court.

Agent Morgan will assert Supremacy Clause Immunity to Hennepin County's prosecution of his on-duty defensive actions in enforcing federal immigration law. "[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." *Mesa,* 489 U.S. at 133.

Agent Morgan will also plead self-defense and defense of others in the course of his federal law enforcement duties. *See* D.E. 1 (Defendant's Notice of Removal), at 8. Supreme Court caselaw provides that these defenses provide the basis for removal jurisdiction. *See Mesa*, 489 U.S. at 128 ("Thus removals of prosecutions on account of acts done in enforcement of the revenue or prohibition laws or under color of them properly include those acts committed by a federal officer in defense of his life, threatened while enforcing or attempting to enforce the law. Such acts of defense are

really part of the exercise of his official authority. They are necessary to make the enforcement effective."); *Maryland v. Soper*, 270 U.S. 36, 42 (1926).

### 3. No Supreme Court Precedent, Including *Mesa*, Mandates a Remand of this Case.

Indeed, there is but a singular case that stands as an exception to the Court's usual embrace of removal. Though it superficially involves a driving incident, its facts and law run far afield from the situation in Agent Morgan's case now before this Court. In *Mesa,* 489 U.S. at 123, the Court refused to allow a United States Postal Service employee to remove to federal court a state criminal prosecution brought to enforce traffic law against on-duty employees. Two separate petitioners in *Mesa* violated California traffic laws and consequently struck and killed a bicyclist and rammed into a police car, respectively. *Id.*

This case does not present even a passing resemblance to *Mesa*. First, as a matter of fact, neither the bicyclist who was fatally struck or the police officer were alleged to have initiated the encounter by attacking the postal employees. Indeed, the postal workers' alleged violation of the laws resulted in a civilian death; no such tragedy occurred here due to Officer Morgan's successful deescalation of the Cadillac's attack. Second, as a matter of law, *Mesa* predated the 2011 Congressional amendments that lowered the removal pleading standard for prong two from causation to a mere relationship. Third, the postal employees alleged no local bias necessitating a federal forum. *Id.* at 137-38. Fourth, and perhaps most critically, the fighting issue in *Mesa* was prong three. In particular, the government argued that it need not predicate its removal motion on the averment of a colorable federal defense,

which the errant postal workers notably lacked. *Id.* at 129. The Court rejected this attempt to read out a clear statutory requirement. *Id.* at 139. Strictly on that basis, it affirmed the appellate court holding that "federal postal workers may not remove state criminal prosecutions to federal court when they raise no colorable claim of federal immunity or other federal defense." *Id.* at 124.

Agent Morgan makes no such disabling argument here. To the contrary, he vigorously asserts a federal defense and Supremacy Clause immunity for on duty conduct and assertion of law enforcement authority.

## III. The Statutory Intent Embraces This Case

Long and painful history underscores why "Congress has decided that federal officers, and indeed the Federal Government itself, require the protection of a federal forum. This policy should not be frustrated by a narrow, grudging interpretation of § 1442 (a)(1)." *Willingham,* 395 U.S. at 407.

### A. Congress Enacted Section 1442 to Counter Local Bias.

"The federal officer removal statute has had a long history," dating back to nearly the origins of the national union and consistent with our reasons for uniting under one supreme flag. *See Id.* at 405. "Congress enacted the original federal officer removal statute near the end of the War of 1812. . . . This initial removal statute was '[o]bviously . . . an attempt to protect federal officers from interference by hostile state courts.'" *Watson,* 551 U.S. at 147–48.

The Supreme Court has consistently recited the original intent of the statute in order to reflect upon its proper application "to protect the Federal Government

from state-court 'interference with its operations'," *Plaquemines Par.,* 146 S.Ct. at 1057 , "Congress has long authorized federal officers and their agents to remove suits brought against them in state court to federal court." *Id.* Congress was especially concerned about states prosecuting federal agents who were enforcing unpopular federal law. *Id.*

There are a host of reasons the removal statute is essential to preserving the proper balance between the state and federal governments:

> The removal statute's 'basic' purpose is to protect the Federal Government from the interference with its 'operations' that would ensue were a State able, for example, to 'arres[t]' and bring 'to trial in a State cour[t] for an alleged offense against the law of the State,' 'officers and agents' of the Federal Government 'acting . . . within the scope of their authority.' State-court proceedings may reflect 'local prejudice' against unpopular federal laws or federal officials. In addition, States hostile to the Federal Government may impede through delay federal revenue collection or the enforcement of other federal law. And States may deprive federal officials of a federal forum in which to assert federal immunity defenses.

*Watson,* 551 U.S. at 150 (internal citations omitted).

In its most recent ruling on the issue, the U.S. Court of Appeals for the Eighth Circuit likewise emphasized the original intent of the statute:

> The statute's basic purpose is to protect the federal government from interference with its operations that would ensue if a State were able to hail into state court certain officers and agents of the federal government acting within the scope of their authority. State-court proceedings may reflect local prejudice against unpopular federal laws or federal officials. And 'one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court.'

*Griffin,* 175 F.4th at 901 (internal citations omitted).

### B. Hennepin County Has Made A Prolific Record of Its Bias.

The prosecutor who brought this case made clear her motives had nothing to do with Agent Morgan's actions and everything to do with "local prejudice against unpopular federal laws or federal officials." *See id.*

For example, Moriarty asserted in June of 2025, "ICE is being deployed to terrorize people," for simply doing their jobs in busy metropolitan areas. *See* Declaration of Andrew J. Gubash, Ex. A. She has attempted to stymie immigration enforcement, asserting, "Our courts are not staging grounds for federal immigration enforcement. . . Using local taxpayer resources to assist the federal government in civil immigration enforcement is inappropriate." *See id.*, at Ex. B. She claimed radical racial bias by ICE agents, saying, "If you don't have white skin, you are in danger of being stopped by ICE and profiled." *See id.* at Ex. I. She actively encouraged opposition to ICE, saying, "Minnesotans . . . . are not going to back down. . . . They are going to resist this, and I think the administration sees that it's losing the public narrative, and so they are simply escalating, trying to intimidate those of us who are simply trying to do their jobs." *See id.* at Ex. I. The contrast with other alleged criminal cases could not be more dramatic. *See id.* at Exs. J, K, L. The County Attorney repeatedly described Operation Metro Surge as a federal "occupation." *See id.* at Ex. M.

The charges against Agent Morgan are lawfare. Congress designed an answer to this attempted weaponization of the state and local prosecutorial system: the federal removal statute, the purpose of which is "to prevent paralysis of operations of

the federal government." *Gay v. Ruff*, 292 U.S. 25, 32 (1934). It bears recalling that at least one amendment to the removal statute was the "nation's reply to South Carolina's threat of 'nullification.'" *Id.*

But the threat of nullification is neither particularly rare nor remote in time. Indeed, not two years ago, a leading group of U.S. Senators submitted an amicus brief favorably cited by the U.S. Supreme Court noting that areas of "intense political disagreement" are precisely the ground Congress meant to cover when it passed and repeatedly expanded the coverage of federal removal; Senators cited immigration enforcement as a classic example of a potential future landmine:

> Local biases and pressures … motivated federal officer removal in the first place.
>
> For instance, the Trump administration has sought greater enforcement of our immigration laws, after years of nonenforcement created severe public safety and economic problems. . . . It is no secret that … fulfillment of this important work is not without controversy. Cell phone applications have been designed solely to expose ICE agents. Without a federal forum to assert federal defenses, this is significant danger that ICE agents … could face legal actions color by 'local interests or prejudice.'

Brief for U.S. Senators Mike Lee et al. as Amici Curiae in Support of Petitioners at 17-19, *Chevron U.S.A. Inc. v. Plaquemines Par.,* No. 24-813 (U.S. Sept. 11 2025); *cf. Plaquemines Par.,* 146 S.Ct. at 1057 (citing Br. for U.S. Sen. Mike Lee et al. as Amici Curiae at 4-6 for the statute's history). That prophecy has proven prescient in this case. The statute's "principal purpose is to afford the designated classes of defendants the protection of a federal forum when they incur or potentially incur liability under

state law for performing their duty to enforce federal law." *Lockhart v. Kelly*, No. 26-CV-1344 (JMB/JFD), 2026 U.S. Dist. LEXIS 176432, at *3 (D. Minn. Aug. 7, 2026).

The incendiary bias that motivated this case presents a textbook example of precisely why the invocation of the removal statute is necessary and proper here. Like so many removal cases, there exists a direct relationship between this prosecutor's bias and Agent Morgan's duties. "In those cases where true state hostility may have existed, it was specifically directed against federal officers' efforts to carry out their federally mandated duties." *Mesa,* 489 U.S. at 139. Agent Morgan's case must remain in federal court.

### C. Section 1442 was enacted precisely for cases such as this, and beyond.

The list of government and private actors who have found refuge under § 1442 for the full gamut of action known to man is long, vast, and comprehensive. Indeed, even a quite abbreviated list illustrates the broad reach of § 1442 under just Supreme Court caselaw:

- An oil company that engaged in wartime refining of crude oil into aviation gasoline for the U.S. military, *see Plaquemines Par.,* 146 S.Ct. 1052;
- Two federal judges whose compensation was taxed by the county in which they held court, *see Acker*, 527 U.S. at 427;
- A prison warden and chief medical officer accused of torturing a prisoner in a federal penitentiary during a "frolic," *see Willingham,* 395 U.S. at 407;

- A deputy U.S. Marshal serving as a bodyguard to an associate Justice of the United States Supreme Court when said Justice was assaulted by a civilian in between the Justice's court sittings, *see In re Neagle*, 135 U.S. at 76.

Likewise, in the United States Court of Appeals for the Eighth Circuit, the presumption is that a litigant may remove a suit to federal court and the record reflects a host have succeeded in doing so:

- Pharmacy benefits managers sued by the state for allegedly contributing to an opioid epidemic, *see Griffin,* 175 F.4th at 905;
- A private insurance carrier sued by a federal employee beneficiary regarding a subrogation lien, *see Jacks,* 701 F.3d at 1235;
- A United States Department of Agriculture employee who allegedly "intimidated" a property owner's tenant and the tenant's contractor by asserting their potential project would be illegal, *see Larsen v. Frederiksen*, 277 F.3d 1040, 1041 (8th Cir. 2002);
- State police who possessed records relating to a federal criminal defendant's state freedom of information act request, *see United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001);
- A federal appellate judge accused of acting in bad faith by a litigant, *see Meredith v. Van Oosterhout*, 286 F.2d 216, 219 (8th Cir. 1960).

When viewed in this case history, the notion that a federal agent, under relentless attack in a city that all but declared open war on his agency because of political animus towards federal policy, could not defend himself and his partner when under

active attack by a 4,000 pound vehicle in a road rage incident, is nothing less than farcical.[1] That defense must be heard in federal court under the law of this Circuit and the highest Court in the land.

---

[1] The removal invocation is so important, and the removal procedure so critical, that Congress allowed immediate interlocutory appeal of any district court order to remand a case back to state court. *See* Removal Clarification Act, §2, 125 Stat. 545-546. "Here, too, Congress has deemed it appropriate to allow appellate review before a district court may remand a case to state court." *BP p.l.c. v. Mayor of Balt.*, 593 U.S. 230, 235-36 (2021) (statute gives federal appellate courts expansive power to review all grounds for removal).

## CONCLUSION

This case exists because two political movements collided. Officer Morgan is caught in the middle.

Hennepin County's prosecution follows a long and odious tradition of parochial resistance to federal law. That resistance is why Congress protected federal agents who carry out their mission in the face of aggressive state opposition. The prosecutor here has openly advertised her motive for criminalizing federal law enforcement. She follows in the footsteps of officials whose bias drove Congress to pass 28 U.S.C. § 1442. The Court should allow removal and bring the curtain down on Hennepin County's political theater.

The statute is clear. The facts are uncontested. This case belongs in federal court, because in the words of the seminal case guiding this inquiry, "We live under a government of laws and not of men." Neagle, 135 U.S. at 55.

Dated: November 12, 2026

By: /s/ *Rachel K. Paulose*

**PACYGA TRIAL LAWYERS**
Ryan M. Pacyga (No. 321576)
Marie C. Pacyga (No. 391493)
860 Blue Gentian Road, Suite 175
St. Paul, MN 55121
(612) 339-5844
Ryan@MNTrialLaw.com
Marie@MNTrialLaw.com

Attorneys for Defendant

**UPPER MIDWEST LAW CENTER**
Douglas P. Seaton (No. 127759)
Rachel K. Paulose (No. 0280902)
12600 Whitewater Dr., Suite 140
Minnetonka, MN 55343
(612) 428-7000
Doug.Seaton@umwlc.org
Rachel.Paulose@umlc.org

Attorneys for Defendant