**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**
Criminal No. 26-CR-112-NEB

**STATE OF MINNESOTA,**

**v.**

**GREGORY DONNELL MORGAN, JR.,**

***Defendant.***

**POST-HEARING BRIEF OF THE UNITED STATES**

## TABLE OF CONTENTS

**INTRODUCTION** .......... 1

**BACKGROUND** .......... 1

**ARGUMENT** .......... 2

**I. Officer Morgan Was Acting Under Color of His Office.** .......... 3

**II. Officer Morgan Has Colorable Federal Defenses.** .......... 9

**III. The State Has Not Shown that Morgan's Claim to Removal Is Wholly Insubstantial and Frivolous.** .......... 12

**IV. CONCLUSION** .......... 19

## TABLE OF AUTHORITIES

Cases

*Arizona v. Manypenny*,
451 U.S. 232 (1981) ........ 3
*Buljic v. Tyson Foods, Inc.*,
22 F.4th 730 (8th Cir. 2021) ........ 3
*Chevron USA Inc. v. Plaquemines Parish*,
608 U.S. 1, (2026) ........ 2, 3
*City of Brunswick by & through Mayor & Bd. of Comm'rs v. Honeywell Int'l, Inc.*,
184 F.4th 1230 (11th Cir. 2026) ........ 10
*Clifton v. Cox*,
549 F.2d 722 (9th Cir. 1977) ........ 10, 16
*Ellis v. Miller Oil Purchasing Co.*,
738 F.2d 269 (8th Cir. 1984) ........ 18
*Georgia v. Heinze*,
637 F. Supp. 3d 1316 (N.D. Ga. 2022) ........ 7
*Gov't of Puerto Rico v. Express Scripts, Inc.*,
119 F.4th 174 (1st Cir. 2024) ........ 11
*Graham v. Connor*,
490 U.S. 386 (1989) ........ 15
*Graves v. 3M Co.*,
17 F.4th 764 (8th Cir. 2021) ........ 11, 19
*Griffin v. Optum, Inc.*,
175 F.4th 897 (8th Cir. 2026) ........ 2
*In re Neagle*,
135 U.S. 1 (1890) ........ 10
*Kentucky v. Long*,
837 F.2d 727 (6th Cir. 1988) ........ 10
*Latiolais v. Huntington Ingalls, Inc.*,
951 F.3d 286 (5th Cir. 2020) ........ 2, 3, 11
*Lauzon v. Senco Prods., Inc.*,
270 F.3d 681 (8th Cir. 2001) ........ 17
*Mayor of Nashville v. Cooper*,
73 U.S. 247 (1867) ........ 11
*Mesa v. California*,
489 U.S. 121 (1989) ........ passim
*New York v. Tanella*,
239 F. Supp. 2d 291 (E.D.N.Y. 2003) ........ 12
*New York v. Tanella*,
374 F.3d 141 (2d Cir. 2004) ........ 10
*Nsheiwat v. Walmart, Inc.*,
No. 25-1506, 2026 WL 2386713 (8th Cir. Aug. 17, 2026) ........ 18

*Reed v. Madden*,
87 F.2d 846 (8th Cir. 1937) .......... 10
*State of Colorado v. Symes*,
286 U.S. 510 (1932) .......... 3, 11
*Tennessee v. Davis*,
100 U.S. 257 (1879) .......... 11
*Texas v. Kleinert*,
855 F.3d 305 (5th Cir. 2017) .......... 3, 10, 11
*United States v. Medearis*,
65 F.4th 981 (8th Cir. 2023) .......... 7
*United States v. Todd*,
245 F.3d 691 (8th Cir. 2001) .......... 19
*W. Virginia ex rel. Hunt v. CaremarkPCS Health, L.L.C.*,
140 F.4th 188 (4th Cir. 2025) .......... 2, 11
*Willingham v. Morgan*,
395 U.S. 402 (1969) .......... 10
*Wyoming v. Livingston*,
443 F.3d 1211 (10th Cir. 2006) .......... 10

Statutes

8 U.S.C. § 1357(a)(5)(A) .......... 17
18 U.S.C. § 111(b) .......... 8
28 U.S.C. § 1442 .......... 3, 7, 19
28 U.S.C. § 1455(b)(5) .......... 3

## INTRODUCTION

A car swerved twice in front of a law enforcement vehicle on the highway to cut the officers off, and the second swerve was particularly aggressive and dangerous. An on-duty federal officer attempted to control the uncertain, potentially escalating situation by brandishing his weapon and identifying himself as law enforcement. He now faces a state indictment for doing so. Federal law affords him the right to have the validity of his defenses tested in a federal forum.

## BACKGROUND

The facts of this case remain materially uncontested. On February 5, 2026, Officer Gregory Morgan was on duty as part of Operation Metro Surge. Ex. 76 at 2; Transcript ("Tr.") at 37:22-24. He was out on an operation when his team lead ordered that he and his partner, Officer Miles Codner, extract themselves from their location and return to the base. Ex. 67 at 17:765-66; Tr. at 336:21-338:1. On their way back, the driver of a white Cadillac swerved twice in front of Officer Morgan's vehicle. The second swerve was particularly sharp and included hard braking action. Ex. 9 at 00:05-00:09; Tr. at 340:10-344:10. The driver has since admitted to State investigators that he intended to cut off Officer Morgan's vehicle. *E.g.*, Ex. 15 at 2:64-71; Ex. 17 at 1:21-25. In response, Officer Morgan braked and veered to the right. *See* Ex. 9. He immediately drew his service firearm, put it in the low-ready position, and yelled to the driver that he was police and that the driver needed to back up and stop. Tr. at 344:21-345:22, 441:13. Officer Morgan then continued back to base and worked for another two hours as part of his on-call duty in Minnesota. Tr. at 362:3-364:11.

In essence, Officer Morgan was faced with a dangerous act of road rage and had to make a split-second decision as to how to respond; the tactic he chose successfully de-escalated the situation. The State of Minnesota now seeks to punish Officer Morgan for this conduct by charging him with assault with a dangerous weapon, a felony. Ex. 76 at 1.

## ARGUMENT

As the Court noted early on at the hearing: "at this stage the court's role is not to decide the merits of any claim or defense." Tr. at 6:20-21. The sole question is whether Officer Morgan is entitled to removal. The bar is remarkably low. Officer Morgan need not prove his case to have it removed. *Mesa v. California*, 489 U.S. 121, 129 (1989). Instead, he only needs to show that he has a colorable federal defense. *Id.* at 133-34. Further, the Court is required to credit his theory of the case. *Griffin v. Optum, Inc.*, 175 F.4th 897, 902 (8th Cir. 2026). Once he presents his theory of the case, remand is appropriate only if one or the other of two extraordinarily low hurdles are not cleared: either the connection between the challenged conduct and the performance of federal duties is "tenuous, remote, or peripheral," *Chevron USA Inc. v. Plaquemines Parish*, 608 U.S. 1, 12 (2026), or the asserted federal defense is "immaterial and made solely for the purpose of obtaining jurisdiction" or "wholly insubstantial and frivolous," *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 297 (5th Cir. 2020); *accord W. Virginia ex rel. Hunt v. CaremarkPCS Health, L.L.C.*, 140 F.4th 188, 198 (4th Cir. 2025). "The federal officer removal statute is to be 'liberally

construed,' and thus the typical presumption against removal does not apply." *Buljic v. Tyson Foods*, Inc., 22 F.4th 730, 738 (8th Cir. 2021).[1]

Officer Morgan is a federal officer for purposes of the removal statute, *see* Tr. at 301:13-18; Ex. 17 at 4:165-176; Ex. 76 at 2; and the State never contends otherwise. Thus, the Court need only address the remaining two factors for removal: (1) whether the suit is "for or relating to any act under color of such office," 28 U.S.C. § 1442(a)(1); and (2) whether the removing defendant asserts "a colorable federal defense." *Chevron*, 608 U.S. at 6 (quoting *Mesa*, 489 U.S. at 129). Both factors are easily met here.

## I. Officer Morgan Was Acting Under Color of His Office.

Officer Morgan is clearly being prosecuted for an act under color of his federal office or, at the very least, relating to his federal office. At the time of the incident, Officer Morgan was on-duty and driving back to base in response to a direct order. *See* Ex. 16 at 7 (Morgan interview); *id.* at 17-18 (Codner interview). Video evidence

[1] While there is a "strong judicial policy against federal interference with state criminal proceedings" *see* Order, ECF 53 at 2 (quoting *Mesa*, 489 U.S. at 138), that policy does not alter the standard for removal. Rather, concerns about the state's interests are built into the standard itself, which strikes a balance between protecting both state *and* federal interests. *See Arizona v. Manypenny*, 451 U.S. 232, 241-43 (1981) (discussing this balance). For example, post-removal, the state law underlying the criminal proceeding remains the same. *Id.* at 242. And the officer must plead the basis for removal with specificity, *State of Colorado v. Symes*, 286 U.S. 510, 518-19 (1932), provide evidentiary support, *Texas v. Kleinert*, 855 F.3d 305, 313 (5th Cir. 2017), and have a colorable federal defense, *Mesa*, 489 U.S. at 133-34. The Court is required to hold an evidentiary hearing, 28 U.S.C. § 1455(b)(5), where the state has the opportunity to show that the claim to removal is frivolous, *Latiolais*, 951 F.3d at 297. In sum, removal does not strip the state of its ability to prosecute its criminal case. It simply "ensure[s] a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties." *Manypenny*, 451 U.S. at 241.

shows the passenger vehicle swerved twice to cut Officer Morgan off. Ex. 9. At the hearing, the State suggested that the Cadillac driver's braking action may have been merely to avoid hitting the car ahead, Tr. at 426:3-10; but the State's own witness belies this suggestion: "I made the not so bright decision to try to stop him, so I veered into the shoulder and, um, got him to stop." Ex. 17 at 1:21-25; *see* Ex. 15 at 2:69-71 (admitting he "cut him off"); *id.* at 2:53-56, 69 (admitting he "started it 'cause this dude was riding the shoulder" and "that was my bad a little bit").[2] It is also belied by the video evidence showing not one, but two targeted swerves cutting Officer Morgan off, including the braking in the course of the second swerve.

Officer Morgan reported that the driver's conduct caused him to fear for his own safety as well as the safety of others. Ex. 16 at 9:376-95; Ex. 76 (PC Stmt.) at 3; *see also* Ex. 16 at 9:376 ("I just want to be safe."); *id.* at 9:391-95 ("And I [was] fearful for other people's safety . . . You got people on the road."). He perceived the driver's conduct as "attacking him" as it almost caused a collision and it sent his heart "racing" while he was "just trying to get back to the base." Tr. at 343:3-344:10, 354:3-355:10 ("So now I'm feeling a little more scared because I don't know what this guy is about to do."). The situation was even more dangerous because the Cadillac's heavily tinted

[2] The driver also has suggested he considered that Officer Morgan may have been a federal officer. Ex. 15 at 10:449-53 ("So it could be those who won't be named?"); Ex. 17 at 6:235-37 ("I got the Ice vibe from him at first."). It is also far from clear that the driver even believed Officer Morgan was pointing a gun *at him* (as opposed to brandishing it in the low-ready position as Officer Morgan testified): "But it was also like, if that got this guy to threaten this, *maybe he was trying to point it at me, I don't know*. But yeah, I don't know." Ex. 15 at 8:335-49 (emphasis added).

windows prevented Officer Morgan from seeing the hands or faces of the vehicle's occupants—critical input necessary to assess threat levels. *Id.* at 341:9-14.

Initially, Officer Morgan tried to go around the Cadillac as he "was just trying to get away from the guy." Ex. 16 at 6:263-74, 7:282-85, 8:369-73, 11:501-03. But then he faced the aggressive second swerve, which immediately caused Officer Morgan to reach for his gun. *See* Tr. at 354:3-5 ("So when he brake checked, attacking me, so when he brake check, I'm driving a car. He brake check. I jerk. As I'm jerking, I grab my weapon."); Tr. at 428:22-23 (same). Officer Morgan then "tr[ied] to create some type of distance between us," Tr. at 354:22-355:2, but could only go so far to the right since he was (unknowingly) on the shoulder. *See id.* at 345:14-22. Officer Morgan felt he could not merge behind the driver for multiple reasons (*e.g.,* fear of more brake checks or getting boxed in); he did not want to just stop on the highway because that would expose him to the risk of being struck by oncoming traffic; and he felt compelled to keep responding to his direct order. *Id.* at 345:2-22. Officer Morgan also felt the need to address this other driver's reckless conduct, which Officer Morgan perceived as a "threat." *See, e.g.*, *id.* at 345:24-346:5; *id.* at 453:14-17 ("Q. Did you have that threat ruled out by the time you first got side by side, or did you still not know what this Cadillac's intentions were? A. I still didn't know what the intentions were.").[3]

---

[3] Officer Codner similarly testified, "Q. Okay. Did you have any reason to believe that the Cadillac was done with this dangerous driving conduct? A. Yes, sir. Q. Any reason to believe it was done after the second swerve? A. After the second swerve, according to the video and what I'm looking at, I would say no in the sense of, in the event the car that's in front of them, it could have been also a third attempt. Q. A what attempt? A. A third attempt. A third swerve." Tr. at 76:4-14.

In the seconds he had to respond, Officer Morgan shouted, "police stop … back up," and brandished his weapon in the low-ready position. Ex. 16 at 6:263-74; *see also* Ex. 15 at 2:69-75 (Cadillac driver explaining that "I cut him off and then, uh, he pretty much immediately just rolled down his down his window and flashed his whatever [curse] pistol at me. . . . [a]nd I did not flash mine back."). This split-second act was produced by years of training, as Officer Morgan emphasized repeatedly. Tr. at 366:13-18, 440:9-13. In fact, he had used the same approach earlier that day in response to similar conduct.

This act of brandishing his weapon served multiple purposes. It aided in establishing officer presence that was simultaneously announced verbally. It put Officer Morgan in a defensive position in the event the Cadillac driver took another dangerous swerve. *Id.* at 351:5-8 ("This is just, just in case the car comes and slams into me and we, you know, we may wipe out, you know. So it's just in case."). And it was meant to create a stable and safe situation. *Id.* at 440:14-22 ("Q. Okay. Was the point for the people in the Cadillac to see it so they knew you were armed? A. No, it's not -- so the point of it is for me to be safe and for everyone else to be safe."); *id.* at 453:24-454:1 ("Q. All right. And is that consistent with your training also about de-escalation? A. Yes, sir.").[4]

---

[4] Officer Morgan's tactic fulfilled its intended purpose by successfully de-escalating the situation. *See* Tr. at 365:19-23 ("Q. Okay. When in your observation did that danger become eliminated? A. As soon as I gave commands, I show my presence as a law enforcement officer, then the Cadillac stopped his behaviors, his erratic behavior."); *id.* at 368:24-369:9 ("Q. Okay. In addition to impeding, did, did you feel as if you were being assaulted at the time? A. Yes, sir. Q. Why? A. I mean the vehicle was, everything's fast pace. The vehicle is swerving over to my lane. We

Notably, under the removal statute, "a law enforcement officer . . . shall be deemed to have been acting under the color of his office if the officer – (1) protected an individual in the presence of the officer from a crime of violence; [or] (2) provided immediate assistance to an individual who suffered, or who was threatened with, bodily harm." 28 U.S.C. § 1442(c)(1) & (2). Both provisions apply here. Officer Morgan was driving his partner, who was in the back seat. The Cadillac driver swerved and braked dangerously, giving probable cause of forcible assault, interference, and impeding with a deadly weapon (the car) on a federal officer. *See* ECF 26 (USA Stmt.) at 12-16; Tr. at 364:15-20 (testifying driver committed federal offenses of interference and assault with vehicle). That is a "crime of violence" under section 1442(c)(1). *Georgia v. Heinze*, 637 F. Supp. 3d 1316, 1324–25 (N.D. Ga. 2022) (officers satisfied color of office requirement because—crediting defense's theory—defendants fired weapons after suspect pointed gun at them, violating section 111); *cf. United States v. Medearis*, 65 F.4th 981, 987 (8th Cir. 2023) ("Comparing the elements of a § 111(b) conviction to the Guidelines definition of crime of violence, we conclude, as our sister circuits have, that a § 111(b) conviction constitutes a categorical crime of violence."). Officer Morgan believed the unknown driver presented a threat of bodily harm to Officer Morgan and his partner; and as a means of protection, he took the act charged here: brandishing his weapon. He therefore "*shall* be deemed to have been acting under the color of his office." 28 U.S.C. § 1442(c) (emphasis added).

---

could have crashed into that vehicle. It could have been very bad, but I de-escalated it. Q. Okay. A. And like I said, we all here today, and everyone is safe.").

DHS and ICE policy provides further support that Officer Morgan was acting under color of his office during this incident. For example, DHS policy states, "In an exigent situation, for self-defense or the defense of another, DHS LEOs are authorized to use any available object or technique in a manner that is objectively reasonable in light of the circumstances." Ex. 22 (DHS Policy) at 4. And ICE policy states, "Use of force is necessary when it is reasonably required to carry out the [officer's] law enforcement duties in a given situation" considering the totality of circumstances and when there are no reasonable alternatives available. Ex. 23 (ICE Directive) at 7; *see also id.* at 1 n.1; Section III, *infra.* Factors to consider in determining the overall reasonableness of a use of force include the "severity of the crime/offense at issue," the existence of an immediate perceived threat, the existence of a weapon, and whether the subject has forcibly assaulted or impeded the officer while he was engaged in his official duties. Ex. 22 (DHS Policy) at 2 & n.3. Also relevant is the presence of others and the perceived emotional state of the suspect. *Id.*

Officer Morgan's conduct was both necessary and objectively reasonable under DHS and ICE policy. Ex. 22 (DHS Policy) at 2 & n.3. The Cadillac driver's conduct depicted on the video (*see* Ex. 9) gave probable cause of a serious federal crime presenting grave risks to Officers Morgan and Codner's safety. *See* 18 U.S.C. § 111(b); ECF 26 (USA Stmt.) at 13-16. Indeed, Officer Morgan testified at the hearing that he believed there had been a violation of the federal law against impeding or assaulting a federal officer. *See* Tr. at 368:6-369:9; *id.* at 364:15-25; *e.g., id.* at 420:10-17 (on

cross-examination; "Like I said, I didn't choose that car. That car chose us. I didn't know who that vehicle was. I didn't know who that person was. That person decided to get in the way of us and impede us. They impeded us, which is a federal, federal felony. It's a crime. I didn't choose that car. I was just driving following orders. That's all I was doing. That car got in the way and stopped movement.").

Officer Morgan's response to this dangerous situation must also be evaluated from the perspective of an officer on the scene dealing with rapidly unfolding and uncertain circumstances. Ex. 22 (DHS Policy) at 2 (discussing Supreme Court precedent). DHS and ICE policy emphasize the importance of de-escalation efforts and warnings (where feasible), as well as tactics to bring a situation under control safely. *See generally* Exs. 22-23 (DHS Policy and ICE Directive). That is precisely what Officer Morgan attempted to do here, and he did so successfully. *See* Ex. 16 at 9:376-78 ("It's irate and I just want to be safe and like, hey, police, you know, back up like trying to clear it, like just back up, that's all.").[5]

## II. Officer Morgan Has Colorable Federal Defenses.

The evidence establishes multiple colorable federal defenses. First, Supremacy Clause immunity, which is available for "necessary and proper" acts under federal

[5] Though not necessary to the question of removal but important for context, just prior to this incident, Officer Morgan was involved in another incident where individuals became hostile and one even threatened to kill Officer Morgan if he did not leave. Tr. at 336:5-9. Officer Morgan and other ICE agents were then ordered to leave and return to base. *Id.* at 336:10-18. Some cars followed them and Officer Morgan was stuck at a traffic light with a car tailing him. *Id.* at 338:20-341:3. Soon after, Officer Morgan got on the highway only to be approached by the tinted Cadillac trying to cut him off, something Officer Morgan believed could have been part of the prior encounter. *Id.* at 340:22-341:3, 343:5-15, 453:5-10.

authority. *In re Neagle*, 135 U.S. 1, 75 (1890). This standard does not require the challenged act to "in fact" have been necessary or in retrospect justifiable; only that the officer reasonably thought it to be. *Clifton v. Cox*, 549 F.2d 722, 725, 728 (9th Cir. 1977); *see Texas v. Kleinert*, 855 F.3d 314–15 (5th Cir. 2017); *Wyoming v. Livingston*, 443 F.3d 1211, 1220-22 (10th Cir. 2006); *New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004); *Kentucky v. Long*, 837 F.2d 727, 745-46 (6th Cir. 1988); *Reed v. Madden*, 87 F.2d 846, 852-53 (8th Cir. 1937) (habeas case applying *Neagle* principles and emphasizing, "What [the defendant] did, he believed to be necessary for the protection of himself and others.").

Officer Morgan need only "sufficiently put in issue" his defense for removal to be proper. *Willingham v. Morgan*, 395 U.S. 402, 407, 409 (1969). This jurisdictional inquiry is entirely separate and distinct from the question of validity—and indeed the jurisdictional standard can be construed as broader than the defense itself. *Mesa*, 489 U.S. at 128–29; *City of Brunswick by & through Mayor & Bd. of Comm'rs v. Honeywell Int'l, Inc.*, 184 F.4th 1230, 1250 (11th Cir. 2026) (quoting *Mesa*, 489 U.S. at 129); *e.g.*, *Willingham*, 395 U.S. at 405 ("On this view, the test for removal should be broader, not narrower, than the test for official immunity. We agree."). For example, applying this test in *Texas v. Kleinert*, the Fifth Circuit in 2017 analyzed the colorable defense at a high level. It explained, "As we discuss more fully below, Supremacy Clause immunity protects federal officers, acting within their federal authority, from liability under state law." *Kleinert*, 855 F.3d at 313. It continued, "Because Kleinert plausibly alleged that he was acting as a federal officer at the time

of the shooting, he sufficiently asserted a colorable federal defense. Kleinert therefore properly removed the state-court action, and the district court validly exercised its subject matter jurisdiction." *Id.*

That same analysis governs here. Officer Morgan testified that he believed he was acting pursuant to his duty to protect his partner and to carry on his duties, and given the uncertainty of the situation, he felt he needed to brandish his weapon to help establish officer presence, de-escalate, and bring about a stable, safe situation. Officer Morgan's defense is supported with a high level of detail and evidentiary basis, *i.e.*, it is "not without foundation and is made in good faith." *Colorado v. Symes*, 286 U.S. at 519. Nor is it "immaterial and made solely for the purpose of obtaining jurisdiction" or "wholly insubstantial and frivolous." *Latiolais*, 951 F.3d at 296-97; *W. Virginia ex rel. Hunt*, 140 F.4th at 198 (quoting *Gov't of Puerto Rico v. Express Scripts, Inc.*, 119 F.4th 174, 186 (1st Cir. 2024)). Officer Morgan has sufficiently put the defense at issue, and its validity must be litigated and tried in this federal forum. *Cf. Graves v. 3M Co.*, 17 F.4th 764, 773 (8th Cir. 2021) ("When the removed cases are litigated on the merits in federal court, it may be that 3M will fail to prove its federal contractor defense . . . .").

Officer Morgan has also put other federal defenses in issue. To constitute a federal defense, it is only necessary that a part of that defense turn on federal law. *See Mesa*, 489 U.S. at 128-29 (quoting *Mayor of Nashville v. Cooper*, 73 U.S. 247, 252 (1867)). As a result, a typical state-law defense such as self-defense can be a federal defense. *Id.* at 127–28 (explaining that in *Tennessee v. Davis,* 100 U.S. 257 (1879),

"[p]roof that Davis was not a thief depended on the federal revenue laws and provided the necessary predicate for removal"). Here, state-law defenses are federal for removal purposes because they have federal components.

Both parties at the evidentiary hearing dispute the correct application of federal laws and policies to the evaluation of Officer Morgan's conduct. The parties dispute, for example, the significance of certain language in DHS and ICE policies, and how those policies and related Fourth Amendment principles apply to this case. Similarly, the parties dispute how to characterize the Cadillac driver's conduct under federal law, which has related implications in evaluating Officer Morgan's conduct and indeed casts an entirely federal light on the incident from its inception (this is not the local traffic case theorized by the State). Those disputes raise federal issues at the heart of defenses like defense of self and others, separate from the Supremacy Clause immunity defense, and they must be decided by a federal court. *New York v. Tanella*, 239 F. Supp. 2d 291, 297 (E.D.N.Y. 2003) ("[T]he allegation of self-defense by a federal officer who is performing his duty implicates federal law and 'provide[s] the necessary predicate for removal.'" (quoting *Mesa*, 489 U.S. at 127)).

## III. The State Has Not Shown that Morgan's Claim to Removal Is Wholly Insubstantial and Frivolous.

**1.** During the evidentiary hearing the State attempted to develop multiple factual theories about why Officer Morgan's conduct was unreasonable, violative of agency policy, or outside the scope of his duties. But none of the theories may be credited at the removal stage. Nor do they withstand scrutiny. Regardless, the

question is not who is correct, Officer Morgan or the State, but whether Officer Morgan's defense is colorable.

The State attempted to elicit facts demonstrating that Officer Morgan had other options available to him in response to the Cadillac driver's actions and, therefore, was required under ICE policy to choose those options rather than use force. *See, e.g.*, Tr. at 374:12-375:1; *id.* at 217:20-218:18; 222:3-224:3. The State's theory suffers from several fatal defects and false premises. To begin, Officer Morgan's decision to brandish his firearm and announce himself as police did not violate agency policy language that "Officers may use force only when no reasonably effective, safe and feasible alternative appears to exist." Tr. at 374:12-375:1 (citing Ex. 22 at 2). That language, including in the Department-wide standard in the "General Statement" on force in Exhibit 22, must be understood in the context of the policies and read in conjunction with the 2023 ICE directive contained in Exhibit 23, which implements that standard for ICE officers:

> The requirement that force be used only when no reasonably effective, safe, and feasible alternative appears to exist does not create a duty to retreat, a requirement to wait for an attack before using force, an obligation to meet force with equal or lesser force, or a continuum or checklist of alternative steps that must be tried before resorting to force. *This requirement is only meant to convey the importance of de-escalation, and that such techniques should be employed when reasonable and practical to do so.*

Ex. 23 at 1 n.1 (emphasis supplied). Furthermore, as the Department policy explains: "there may be a range of responses that are reasonable and appropriate under a particular set of circumstances." Ex. 22 (DHS Policy) at 2. "Based on the totality of facts and circumstances, different Authorized Officers may have different responses

to the same situation, any of which may be both reasonable and necessary." Ex. 23 (ICE Directive) at 7. As discussed above, Officer Morgan could have reasonably believed his actions would "effectively bring an incident under control while promoting the safety of LEOs and the public." Ex. 22 (DHS Policy) at 3. Here, displaying his firearm while identifying himself as law enforcement was among the reasonable, de-escalating options available to Officer Morgan.

Officer Morgan could have reasonably thought that the supposed alternative options suggested by the State were not "reasonably effective, safe, and feasible alternative[s]" to de-escalate and take control of the situation. Contrary to the State's suggestion, Officer Morgan was unable to display his metal badge (which was safely locked in his trunk) to announce his presence as law enforcement. Tr. at 100:5-12, 318:2-10. Certainly, he was not required to press his chest against the driver's side window for a prolonged period in an attempt to better display his police vest while operating his vehicle. *Cf. id.* at 99:15-100:4. Officer Morgan's reluctance to drive behind the Cadillac was also reasonable, given the driver's behavior and the possibility of getting boxed in. *See id.* at 312:4-10, 355:11-356:17. Officer Morgan could also have reasonably thought that stopping on the road would place him in further danger, prevent him from "keep[ing] an eye on the threat," and delay him from carrying out his orders to return to base quickly. *See id.* Similarly, arresting the driver of the Cadillac would have been inconsistent with following his orders to get back to base safely, *id.* at 365:3-11, 445:6-8, particularly given the lack of lights, markings, sirens, or speakers on his rental vehicle, *id.* at 36:7-37:2, 311:4-9. Taking

down the Cadillac's license plate number, *id.* at 421:7-10, 422:7-8, or calling for backup, *id.* at 422:9-10, 445:12-13, would have done nothing to take control of or de-escalate the rapidly developing situation.

But even if, with the benefit of hindsight, one could hypothesize a "reasonably effective, safe, and feasible alternative" to Officer Morgan's conduct, doing so would be tantamount to the very sort of Monday-morning quarterbacking that is forbidden by both Fourth Amendment precedent and agency policy. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."); Ex. 22 at 2 (quoting *Graham*); Tr. at 341:16-23 ("I didn't know why it did what it did. I was just, I started suspicious because I – it's not like hindsight 20/20. It happened so fast. So you are fleeing. You are looking around. You are trying to survive mental, so you are trying to see like what's going on, like why this vehicle, it happened so fast. It's not like the video. This is, this is real life."). As discussed above, a reasonable officer could have believed that Officer Morgan's response was appropriate—and even necessary, restrained, and narrowly tailored—to address the Cadillac driver's behavior.

While Officer Morgan did not violate agency policy in his response to the Cadillac, he could still have acted within the scope of his authority "even though his acts may have exceeded his express authority," and could still be entitled to Supremacy Clause immunity even if he violated department policy or "federal law."

*Clifton*, 549 F.2d at 725-26, 728. For purposes of removal, however, these questions are premature: crediting Officer Morgan's theory of the case, he did not violate policy.

**2.** Many of the State's theories are simply irrelevant to the determination of Officer Morgan's federal defense, let alone to the propriety of removal. For example, as explained in the United States' Statement of Interest, whether Officer Morgan was legally permitted to drive on the shoulder (Tr. at 415:16-416:6) has no bearing on whether this case is removable. ECF 26 (USA Stmt.) at 25. He also testified that he did not realize he was on a shoulder. Similarly, the State attempted to poke holes in the testimony of Officers Morgan and Codner on several topics, including whether they continued to work on the day of the incident after returning to base, *id.* at 336:15-337:13, whether there were cars behind them, *id.* at 415:22-25, and whether the officers reported the incident (which Morgan and Codner testified they in fact did), Tr. at 445:21-446:7; *see id.* 85:21-23, 95:9-96:11. But all the material facts of this case are uncontested and *on video*. Exs. 9-11, 50, 54. Although he refused to testify at this hearing, the driver of the Cadillac admitted to the underlying conduct in interviews with local police. Exs. 14-15, 17-18. It is undisputed that Officer Morgan was a federal officer, on duty, and had been ordered to return to base. Tr. at 337:17-338:1. Whether he and Officer Codner subsequently ended their day, filed reports correctly, or whether any of the conduct the State alleges occurred after the incident for which Officer Morgan is being charged actually transpired, are wholly irrelevant to removal.

**3.** Similarly, it is irrelevant whether Officer Morgan had a "reasonable suspicion" that the Cadillac "was connected to any immigration violations." *Id.* at

412:3-5. The federal statute authorizing Officer Morgan to make arrests "for any offense against the United States, if the offense is committed in the officer's or employee's presence," 8 U.S.C. § 1357(a)(5)(A), only requires that the officer be "performing duties *relating to* the enforcement of the immigration laws at the time of the arrest" and that "there is *a likelihood* of the person escaping before a warrant can be obtained for his arrest." *Id.* (emphasis added). Officer Morgan was performing duties related to the enforcement of immigration laws by following a direct order to return to base during Operation Metro Surge, *see supra* at 3-5, and there was a likelihood of the other driver escaping given that he was driving down the highway, Ex. 24 at slide 84.[6]

**4.** Finally, the State's expert declaration should be excluded or ignored but, in any event, is not relevant at the removal stage. To be admitted under Federal Rule of Evidence 702, proposed expert testimony "based on scientific, technical, or other specialized knowledge" must "be useful to the finder of fact in deciding the ultimate issue of fact," and "the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires." *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686

---

[6] The State's paraphrase of Section 1357 in its opposition to removal misstates the statute's language. *Compare* Opp'n, ECF 8 at 10 ("ICE agents may make arrests . . . only if the agents are engaged in immigration enforcement at the time of the offense and the arrestee would likely escape before a warrant could be obtained.") *with* 8 U.S.C. § 1357(a)(5)(A) (authorizing arrests "if the officer or employee is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest.").

(8th Cir. 2001). The State's expert declaration does not come close to meeting that standard. To begin, much of the report is premised on the belief that Officer Morgan used deadly force, which he did not. Ex. 27 ¶ 30-32 (relying on standard for deadly force in "application of principles"); Tr. at 247:10-248:2; *see* Ex. 22 (DHS Policy) at 8 ("The act of establishing a grip, unholstering, or pointing a firearm does not constitute a use of deadly force."). Second, on the question of when officers may point their firearms (the alleged conduct that Officer Morgan is being prosecuted for), the declarant discusses what is "well understood," rather than any kind of specialized knowledge. Ex. 27 ¶ 22. The change in standard is telling: many of the other paragraphs discuss "generally accepted" practices or principles, *see, e.g.*, *id.* ¶ 2, but on this issue the declaration switches to the more generic verbiage. Such opinions, which "do not rely on or apply any specialized knowledge or expertise," do not assist a finder of fact and should be excluded. *Nsheiwat v. Walmart, Inc.*, No. 25-1506, 2026 WL 2386713, at *2 (8th Cir. Aug. 17, 2026); *Ellis v. Miller Oil Purchasing Co.*, 738 F.2d 269, 270 (8th Cir. 1984) ("Where the subject matter is within the knowledge or experience of lay people, expert testimony is superfluous."). Third, the report addresses counterfactuals or irrelevant questions such as whether Officer Morgan was permitted to drive on the shoulder, Ex. 27 ¶ 28, and the conduct of a traffic stop or arrest, *id.* ¶ 29. Fourth, the declaration effectively makes statements applying the Fourth Amendment (*see, e.g.*, paragraph 32), but that is a "question of law for the court to decide." *Nsheiwat*, 2026 WL 2386713, at *2.

At the very least, it would be premature to consider the State's expert declaration. At the removal stage, the question is not whether Officer Morgan's federal defense will prevail. *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001); *Graves*, 17 F.4th at 771-73. It is whether his defense is colorable, such that this case should proceed in a federal forum. Officer Morgan has presented evidence showing that his federal defense is colorable. Nothing in the expert declaration changes that.

## IV. CONCLUSION

This Court should accept jurisdiction of this case under 28 U.S.C. § 1442 and deny the Hennepin County Attorney's remand motion.

Dated: November 12, 2026

JONATHAN D. GUYNN
Acting Assistant Attorney General
Civil Division

PAUL E. WERNER
Assistant Director
Civil Division, Torts Branch

SIEGMUND F. FUCHS
Senior Trial Counsel
Civil Division, Torts Branch

/s/ Paul C. Quast
Paul C. Quast
Colorado Bar No. 49154
Senior Trial Attorney
/s/ Jonathan R. Myers
Jonathan R. Myers
D.C. Bar No. 1601183
Trial Attorney
U.S. Department of Justice
Constitutional Torts Staff
P.O. Box 7146, Ben Franklin Station
Washington, D.C. 20044-7146
202-256-9250
paul.c.quast@usdoj.gov

jonathan.r.myers@usdoj.gov

*Attorneys for Interested Party United States of America*