**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MINNESOTA**

| | |
|---|---|
| **STATE OF MINNESOTA,**<br><br>**v.**<br><br>**GREGORY DONNELL MORGAN, JR.,**<br><br>***Defendant.*** | **No. 26-CR-112 (NEB)** |

# STATE OF MINNESOTA'S RESPONSE TO THE DEFENDANT'S AND THE UNITED STATES' POST-HEARING BRIEFS CONCERNING REMOVAL

Neither defendant Gregory Morgan nor the United States has provided a sound reason to overcome the presumption that this state criminal prosecution should remain in state court. They start from the assumption that the defendant's theory of the case and account of the facts controls, but that assumption does not hold when, as here, an evidentiary hearing demonstrated significant flaws in both. Those flaws mean the defendant cannot establish either that he was acting under color of his federal office or a colorable federal defense. On the color-of-office prong, the defendant eschews meaningful engagement with the facts or law, instead opting to describe in detail three Supreme Court cases that do not militate in favor of removing this case. On the colorable-federal-defense prong, the defendant asserts an intention to claim Supremacy Clause immunity and other federal defenses but neglects to provide any argument to support that assertion. Failing under the established removal inquiry, the defendant trains his fire on the Hennepin County Attorney, claiming that she has shown bias in statements about federal immigration enforcement. That claim is inapposite, inaccurate, and not tailored to the defendant in any event. The Court should remand this prosecution to state court.

# I. The Court should not credit the defendant's theory of the case or his incredible testimony.

Much of the defendant's argument hinges on crediting his theory of the case and believing his post-hoc testimony about what supposedly led to his decision to draw his firearm and point it at the Cadillac. But those premises are flawed.

## A. The Court is not required to credit the defendant's theory of the case.

The defendant is not correct to claim that "his theory of the case prevails." ECF No. 75 at 13; *see also* ECF No. 77 at 2 (U.S. brief advancing a similar argument that "the Court is required to credit [the defendant's] theory of the case"). The cases relied on to support that proposition—principally the Supreme Court's decision in *Jefferson County v. Acker*, 527 U.S. 423 (1999), which in turn was relied on in the United States' cited authority, *Griffin v. Optum, Inc.*, 175 F.4th 897 (8th Cir. 2026)—in fact stand only for the uncontroversial principle that courts deciding removal issues should not "demand[] an airtight case on the merits" of a potential federal defense before removing a case. *Acker*, 527 U.S. at 432; *see also Georgia v. Meadows*, 88 F.4th 1331, 1346 (11th Cir. 2023) (explaining that "*Acker* credited . . . [the defendants'] theory of the case when it declined to choose between [disputed] readings of a municipal ordinance," where "that deference involved crediting a *plausible* reading of a *specific* legal authority" and was necessary to avoid pre-judging the merits) (internal quotation marks omitted). But nowhere do these cases (or any others) instruct that a court should blindly accept a defendant's *ipse dixit* account regarding disputed facts or uncritically accept his claimed entitlement to a federal defense, as the defendant appears to suggest. *See* ECF No. 75 at 21-22.

"*Acker* does not instruct [courts] blindly to accept" or "rubber stamp" a defendant's claims or to "eschew [their] duty of independent review." *Meadows*, 88 F.4th at 1346. "Instead, . . . judicial duty demands an independent assessment" of the relevant facts and arguments. *Id.* And

that is particularly true where, as here, the Court has already conducted a full-blown evidentiary hearing and is thus both equipped and "entitled to evaluate the demeanor and presentation of witnesses, assess the credibility of testimony including [the defendant's], and weigh competing evidence," *id.* at 1348—just as this Court routinely does in other contexts. After all, the entire point of the evidentiary hearing requirement under 28 U.S.C. § 1455(b) is to permit district courts to evaluate the actual evidence, so that then, "after such hearing, [the court] shall make such disposition of the prosecution as justice shall require." *Id.* § 1455(b)(5). By contrast, the defendant's preferred approach—which would make his narrative automatically controlling at the removal stage, even after an evidentiary hearing—would substantially deprive that § 1455(b) evidentiary hearing of its function.

Other district courts in a similar posture have had no trouble remanding prosecutions to state court when a defendant's presentation at an evidentiary hearing was insufficient or lacked credibility. *See Meadows*, 88 F.4th at 1348 (affirming district court's remand order because "[t]he district court carefully weighed all evidence relevant to [the defendant's] charged conduct before finding that he failed to 'provide sufficient evidence'" to support his request for removal). Those other courts properly held the defendant seeking removal to his "burden of supporting his factual averments with competent proof," *New York v. Trump*, 683 F. Supp. 3d 334, 344 (S.D.N.Y. 2023), and evaluated the defendant's claims in light of the documentary evidence and other sworn testimony presented at the evidentiary hearing before ultimately rejecting the asserted federal defense as implausible. *See id.* at 345 ("The evidence overwhelmingly suggests that the matter was a purely a personal item of the President—a cover-up of an embarrassing event. . . . It does not reflect in any way the color of the President's official duties."); *see also Georgia v. Clark*, No. 1:23-CV-03721-SCJ, 2023 WL 7012663, at *3, *8 (N.D. Ga. Sept. 29, 2023), *aff'd on other*

*grounds*, 119 F.4th 1304 (11th Cir. 2024) (explaining that "*[b]ased on the facts adduced at the hearing and the arguments put forth by the Parties*, the Court must determine whether the Defendant has met his burden" to support removal, and ultimately concluding that the defendant's "vague and uncertain assertions" were not enough to carry that burden, especially when weighed against the other evidence submitted at the hearing) (emphasis added).

This Court should do the same here. And because the defendant has not provided the required "competent proof . . . linking his conduct"—threatening another motorist with a firearm during a traffic incident—with "his [federal] office," *Meadows*, 88 F.4th at 1348 (cleaned up), the Court should remand this case to Minnesota state court. *See generally Willingham v. Morgan*, 395 U.S. 402, 409 n.4 (1969) (noting that because there is a "more compelling state interest in conducting criminal trials in the state courts," defendants may need to make a "more detailed showing" to obtain removal of a criminal prosecution to federal court).

**B. The defendant's testimony was not credible.**

The Court should likewise reject the defendant's tacit assumption that his testimony is an authoritative account of what occurred. In fact, the defendant's testimony lacked credibility.

For example, the defendant repeatedly insisted that he did not know he was driving on the shoulder of the road, outside the lanes of traffic, *see* Tr. 345-46, 413, 415-16, even though he recognized that there was a solid white line to his left, Tr. 415, no cars in front of him, *id.*, and many cars in the lane to his left, Tr. 416. By his own admission, the defendant is an experienced law enforcement officer, Tr. 370-72, and has a valid driver's license, Tr. 387; it is highly implausible that the defendant did not recognize that he was on the shoulder of the highway. The defendant testified that as a law enforcement officer, he "ha[s] to pay attention to everything, everything that's going on," Tr. 418-19, do what he can to "protect [his] partner, protect [himself],

and protect the people in the road," Tr. 419, and that he was "focused" on doing his job "professionally," *id.* A law enforcement officer, working hard to be aware of his environment and ensure that he drives safely for his, his partner's, and the community's safety, would take care to be aware of and follow traffic rules; the defendant's decision to bypass traffic and drive on the shoulder was a choice, not a mistake. He nonetheless urges the Court to credit his claim that he believed that the driver of the Cadillac was "assault[ing]" him, and not simply trying to prevent him from unfairly bypassing traffic while unlawfully driving on the shoulder. Tr. 368-69.

Perhaps even more incredibly, the defendant described the position at which he held his weapon when pulled alongside the Cadillac as the "low ready position," a "defensive posture just in case something happens," and demonstrated it with his weapon at the bottom of his beard. Tr. 339-440. The Court noted that in the defendant's demonstrations of the "low ready" position, his firearm was "a couple different places" at different times throughout his testimony. *Id.* The defendant's testimony regarding the placement of his firearm when pulled alongside the Cadillac contradicted that of his partner, Myles Codner. Tr. 350-51. The defendant also demonstrated a "high ready" position so high that in order to for him hold his gun at "high ready," he would have had to raise his firearm to forehead level. Tr. 441. The defendant may suggest that the position of his firearm was a trained response, *see generally* Ex. 77 (Rylant Report), but it is impractical and implausible that the position at which he held his weapon was a defensive posture he was trained to establish. Indeed, the defendant admitted that "[he is] not train[ed] to show [his] weapon just so you can see [his] weapon." Tr. 440. The more plausible inference is that the Defendant removed his weapon from the holster and pointed it at the Cadillac because he was angry and wished to scare or intimidate the occupants of that vehicle. The Court should decline to credit his contrary testimony, including the inconsistent versions of where he held his firearm.

The result of the defendant's incredible testimony is argument unmoored from the factual record or any sense of objective reality. After enumerating several cases with facts unlike what occurred here as support for removing this case, *see* ECF No. 75 at 28-29, the defendant recounts his version of this case: "a federal agent, under relentless attack in a city that all but declared open war on his agency because of political animus towards federal policy, could not defend himself and his partner when under attack by a 4,000 pound vehicle in a road rage incident." *Id.* at 29-30. Entirely elided from this "farcical," *id.* at 30, account of the relevant facts is the defendant's unnecessarily aggressive driving, his apparent (and unreasonable) assumption that the Cadillac's occupants were not only aware of his status as an ICE officer but also potentially targeting him on that basis, and his transformation of an incident where he was driving dangerously and unlawfully on a shoulder and then drew and pointed a firearm at another driver who had the temerity to try to slow him down by briefly moving to cut him off into "an attack" on him and his partner. The Court should reject the defendant's version of what occurred in this case as untethered from the facts.

## II. The defendant fails to establish that he was acting under color of federal office.

The defendant is not being prosecuted "for or relating to any act [taken] under color of . . . office[.]" 28 U.S.C. § 1442(a)(1). He is not being prosecuted for "driving a government authorized vehicle," "transporting another federal officer," or for taking "defensive actions" when another driver moved partially onto the shoulder to slow down and block the defendant from jumping the queue that had formed where one highway merged with another. ECF No. 75 at 15. Instead, the defendant is being prosecuted for the aggressive act of pulling out his gun and pointing it at the Victims—a criminal act unrelated to the defendant's duties as a federal immigration officer.

The defendant identifies no ICE regulation, policy, or guidance that authorized him to threaten another motorist with a firearm simply because that motorist suddenly braked in front of him. *Cf. Meadows*, 88 F.4th at 1346 (explaining that the relevant precedent "does not instruct us blindly to accept an expansive proclamation of [an officer's] power relying on no source of positive law. Instead, our judicial duty demands an independent assessment of the limits of [the] office."). Nor, as the State pointed out in its post-hearing brief (ECF No. 74 at 29-30) is there any such policy. The general guidance identified by the United States—which allows ICE agents acting in self-defense or defense of another "to use any available object or technique in a manner that is objectively reasonable in light of the circumstances," ECF No. 77 at 8 (quoting Ex. 22)—hardly justifies the defendant's choice to point his firearm at the Cadillac because it tried to slow him down as he was unlawfully speeding along the highway shoulder, attempting to bypass traffic. Nor was the defendant's use of force directed at the Victims "reasonably required to carry out the [officer's] law enforcement duties." *Id.* (quoting Ex. 23). Indeed, rather than identifying a federal immigration-enforcement-related duty he was accomplishing, the defendant instead urges that "[t]he 'for or relating to' standard is lenient," and argues that he satisfies that standard because he was "on duty," "in uniform," "driving a government authorized vehicle," and "en route back to a base of operations" when he undertook the supposedly "defensive actions" of threatening the Victims with his firearm. ECF No. 75 at 15 (some capitalization omitted).

As the Supreme Court recently made clear, although "[t]he phrase 'relating to' sweeps broadly," it is "not 'so broad that it is meaningless.'" *Chevron USA Inc. v. Plaquemines Par.*, 608 U.S. 1, 11 (2026) (quoting *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 93 (2020) (Thomas, J., concurring)). Rather, it "requires a connection that is not 'tenuous, remote, or peripheral.'" *Id.* at 12 (quoting *Rutledge*, 592 U.S. at 94 (Thomas, J., concurring)). But that is precisely the type of

connection the defendant identifies by focusing on the fact that he was on duty, in uniform, and driving back to base. As numerous courts have recognized, "it is not enough for a federal employee to simply allege that at the time of the incident she was 'on duty and acting in the course and scope of her federal employment.'" *Minnesota v. Weber*, 589 F. Supp. 2d 1170, 1173 (D. Minn. 2008) (quoting *Mesa v. California*, 489 U.S. 121, 123 (1989)); *see also Georgia v. Waller*, 660 F. Supp. 952, 954 (M.D. Ga. 1987) (explaining that the court does not have "jurisdiction over any state criminal offense merely because it was committed by a federal official while on duty"). Contrary to the defendant's suggestion, the federal officer removal statue does not "reach all suits with any attenuated connection to federal duties." *Plaquemines Par.*, 608 U.S. at 12.

For the reasons the State identified in its post-hearing brief (ECF No. 74 at 28-31), the defendant's act of pulling his firearm on another motorist because that motorist suddenly braked in front of him is at most peripheral to the defendant's federal immigration enforcement authority. The defendant did not point his weapon at the Victims as part of any immigration enforcement action. *See* Tr. 112-13, 368. The defendant was not attempting to enforce local traffic laws, and he had no authority to do so even if he were. Tr. 368. Although an ICE agent has authority to make arrests for federal criminal offenses committed in his presence, he may only do so if he "is performing duties relating to the enforcement of the immigration laws at the time of the arrest and if there is a likelihood of the person escaping before a warrant can be obtained for his arrest." 8 U.S.C. § 1357(a)(5)(B). And, in any event, the defendant admitted that he did not pull his weapon in an attempt to seize or arrest the Victims, Tr. 365, and his partner, Codner, correctly recognized that cutting the defendant off in traffic did not supply "any reasonable suspicion or reason to stop" them, Tr. 113.

The Supreme Court cases the defendant relies upon—*In re Neagle*, 135 U.S. 1 (1890); *Willingham v. Morgan*, 395 U.S. 402 (1969); and *Plaquemines Parish*, *supra*—only underscore the defendant's failure to establish a sufficiently close relationship between the defendant's conduct and his federal authority. *See* ECF No. 75 at 16-21. Those cases do not, as the defendant asserts, involve "facts . . . remarkably parallel to the facts of this case." *Id.* at 16. *In re Neagle* involved a Deputy U.S. Marshal who was instructed to protect a Supreme Court Justice "from any assault that might be attempted upon him by Terry and wife," and who shot and killed Terry when he was in the midst of attacking the Justice and appeared to be reaching for a knife. 135 U.S. at 52-53. The Supreme Court found that, unlike here, there was "positive law investing the marshals and their deputies with powers which not only justify what Marshal Neagle did in this matter, but which imposed it upon him as a duty." *Id.* at 68. The Court explained: "So the marshal of the United States, charged with the duty of protecting and guarding the judge of the United States court against this special assault upon his person and his life, being present at the critical moment, when prompt action was necessary, found it to be his duty—a duty which he had no liberty to refuse to perform—to take the steps which resulted in Terry's death." *Id.* at 69. Here, in contrast, the defendant points to no "positive law" authorizing him to threaten the Victims with a gun for slowing down in front of him on the highway, and he certainly was not required to do so by any "duty which he had no liberty to refuse to perform." *Id.* at 68-69.

Unlike here, *Willingham* was a civil case in which the plaintiff "filed a 'scattergun' complaint, charging numerous wrongs on numerous different (and unspecified) dates." 395 U.S. at 408-09. The Supreme Court found that, "[i]n a civil suit of this nature," it was "sufficient for petitioners to have shown that their relationship to respondent derived solely from their official duties" and the "undisputed fact that petitioners were on duty, at their place of federal employment,

at all the relevant times." *Id.* at 409. The Court noted, however, that had it been a criminal case, "a more detailed showing might be necessary because of the more compelling state interest in conducting criminal trials in the state courts." *Id.* at 409 n.4; *see Arizona v. Manypenny*, 451 U.S. 232, 243 (1981) ("Because the regulation of crime is pre-eminently a matter for the States, we have identified a strong judicial policy against federal interference with state criminal proceedings." (quotation marks omitted)). In a criminal case, defendants must do "more than . . . say that the [crime with which they are charged] was at a time when they were engaged in performing their official duties." *Maryland v. Soper*, 270 U.S. 9, 35 (1926). Instead, they must "negative the possibility that they were doing other acts than official acts at the time and on this occasion, or make it clear and specific that whatever was done by them leading to the prosecution was done under color of their federal official duty." *Id.*; *see also Colorado v. Symes*, 286 U.S. 510, 520 (1932) (holding that the motion to remand to state court should have been granted where, although the defendant had "sufficiently shown that in performance of official duties he and another agent went into the place" where the crime occurred, he had not established that the subsequent murder was committed under color of his federal authority). Here, the defendant has failed to make that showing.

Finally, for the reasons already discussed, *Plaquemines Parish* fails to advance the defendant's cause. There, the Supreme Court discussed the meaning of the term "relating to" in the federal officer removal statute, noting that "a removing defendant need not show that his federal duties specifically required or strictly caused the challenged conduct." *Plaquemines Par.*, 608 U.S. at 11. At the same time, however, the Court emphasized that there must be "a connection" between the charged act and the federal duties "that is not tenuous, remote, or peripheral." *Plaquemines Par.*, 608 U.S. at 12 (quotation marks omitted). Contrary to the defendant's

assertion, there is no sufficient connection between the defendant's federal immigration-enforcement duties and his armed assault on the Victims simply because he "would not have been in Minnesota, let alone driving on a metro highway in his uniform and agency authorized vehicle with his partner in a backseat working on his laptop, but for his federal duties." ECF No. 75 at 21. Nor is it enough that the defendant was "retreating to base to regroup and continue their immigration enforcement operations." *Id.* And the defendant's claim that he was somehow "under attack" because the Victims' Cadillac brake-checked him is an incredible post-hoc rationalization that is contradicted by the video evidence and disputed by his partner, Codner, who correctly recognized that cutting the defendant off in traffic did not supply "any reasonable suspicion or reason to stop" the Victims, Tr. 113. Under these circumstances, the defendant's criminal act of pointing his firearm at another motorist had at most an "attenuated connection to [his] federal duties," *Plaquemines Par.*, 608 U.S. at 12, one insufficient to establish that the defendant is being prosecuted "for or relating to any act [taken] under color of . . . office[.]" 28 U.S.C. § 1442(a)(1).

The United States, but not the defendant himself, asserts that the defendant should "be deemed to have been acting under the color of his office" because he "(1) protected an individual in the presence of the officer from a crime of violence; [or] (2) provided immediate assistance to an individual who suffered, or who was threatened with, bodily harm." ECF No. 77 at 7 (quoting 28 U.S.C. § 1442(c)). The State addressed this argument in its post-hearing brief (ECF No. 74 at 31-35), and the United States offers nothing to convincingly rebut those arguments. Contrary to the United States' assertion (ECF No. 77 at 7), the defendant did not "provide[] immediate assistance" to *Codner* by "brandishing his weapon" at *the Victims* after the Cadillac returned to its lane and rejoined the normal flow of traffic. Nor is "swerv[ing] and brak[ing] dangerously," *id.*, the use of a car as a deadly weapon sufficient to render the Victims' conduct a crime of

violence/violation of 18 U.S.C. § 111(b). *See generally* 18 U.S.C. § 111(b) (increasing the penalty for assaulting a federal officer where the person "uses a deadly or dangerous weapon (including a weapon intended to cause death or danger but that fails to do so by reason of a defective component) or inflicts bodily injury"); *United States v. Wallace*, 852 F.3d 778, 783 (8th Cir. 2017) ("for a car to qualify as a deadly weapon, the defendant must use it as a deadly weapon and not simply as a mode of transportation"). There is thus no merit to the United States' argument that the defendant should be deemed to have been acting under the color of his office pursuant to 28 U.S.C. § 1442(c).[1]

## III. The defendant fails to assert a colorable federal defense.

To merit removal to federal court, the defendant must also articulate a colorable federal defense. *Mesa*, 489 U.S. at 129. But he entirely fails to do so.

### A. The defendant fails to establish a colorable Supremacy Clause immunity defense.

The defendant claims (ECF No. 75 at 22) that he "will assert Supremacy Clause Immunity" and (*id.* at 24) that he "vigorously asserts . . . Supremacy Clause immunity." But nowhere does the defendant actually address the elements of a Supremacy Clause immunity defense, namely that he was authorized to engage in the conduct that served as the basis for the criminal charges and that what he did was no more than what was objectively necessary, proper, or reasonable to do. The defendant has thus waived or forfeited the argument by failing to develop it adequately. *See, e.g.*, *Holschen v. Int'l Union of Painters & Allied Trades*, 598 F.3d 454, 467 (8th Cir. 2010) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court

[1] For largely the same reasons that the defendant and the United States cannot demonstrate that the defendant was acting under color of his federal office, they fail to establish that his conduct was "[a]uthorized by law" as required under the first prong of the Supremacy Clause immunity standard. *See* ECF No. 74 at 36.

to do counsel's work[.]" (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)). But even if he had preserved his Supremacy Clause immunity claim, it would fail for the reasons given in the State's post-hearing brief. *See* ECF No. 74 at 36-45.

The United States in a paragraph contends that the defendant "has sufficiently put the [Supremacy Clause immunity] defense at issue," even if the defendant ultimately "will fail to prove" it. ECF No. 77 at 11 (citation omitted). In the government's telling, the defendant's testimony that he was acting "to protect his partner and to carry on his duties," as well as his subjective feeling that "he needed to brandish his weapon to help establish officer presence, de-escalate, and bring about a stable, safe situation," *id.*, is enough to establish a colorable Supremacy Clause claim. That cursory argument fails in several respects. It takes the defendant's testimony at face value, notwithstanding substantial reasons that that testimony is incredible. *See supra* at 4-6. Relatedly, it relies nearly entirely on what the defendant "felt," ECF No. 77 at 11, without offering a meaningful explanation of why the defendant's subjective view that he was acting appropriately is objectively reasonable. *See* ECF No. 74 at 42. And it rests ultimately on the misapprehension that the defendant's act of "brandish[ing] his weapon" was appropriate to de-escalate. ECF No. 77 at 11. That is exactly backwards. The defendant's decision to point his firearm at or in the direction of the Cadillac dramatically escalated the encounter and magnified the risks that the situation would escalate even further. *See* ECF No. 74 at 39-41. But for the fact that T.B., who apparently also had a firearm on hand, *see* ECF No. 75 at 8, exercised the type of judgment that the defendant's conduct lacked, the situation could quickly have devolved in a manner that exposed many other nearby motorists and passengers to danger.[2]

---

[2] Perhaps in an effort to undermine the State's argument that the defendant's conduct was not necessary or proper, the United States (but not the defendant) attacks (ECF No. 77 at 17-19) the State's expert, Dr. Ian Adams. As an initial matter, it is not clear in what way commenting on the

**B. The defendant fails to establish any other colorable federal defenses.**

Perhaps recognizing the weakness of the defendant's Supremacy Clause immunity defense, both the defendant and the United States refer vaguely to other federal defenses. The defendant (ECF No. 75 at 22-23) invokes "self-defense" and "defense of others," but he identifies no federal statute, regulation, or other authority that entitles him to press those defenses when facing state criminal charges. For its part, and without citation, the United States asserts (ECF No. 77 at 12) that "state-law defenses are federal for removal purposes because they have federal components." But the United States nowhere spells out to what "federal components" it is referring. To be sure, the hearing involved discussion of DHS and ICE policies, and the State (though not the defendant) has explained why those policies and Fourth Amendment principles illustrate the unreasonableness of the defendant's conduct. *See* ECF No. 74 at 40-41 (Fourth Amendment); *id.* at 42-43 (DHS and ICE policies). But simply because those federal authorities illustrate how the defendant's conduct was not necessary or proper for Supremacy Clause purposes, it does not follow that any self-defense or defense-of-other claims that the defendant may seek to assert in state court themselves

---

State's—but not the defendant's—proffered expert "attend[s] to the interests of the United States." 28 U.S.C. § 517. In any event, the federal government's attempt to exclude Dr. Adams's testimony fails. Unlike the defendant's purported expert, *see* ECF No. 74 at 44-45, Dr. Adams is a nationally recognized authority on policing whose analysis was grounded in his experience and relevant to assessing the reasonableness of the defendant's conduct. Unsurprisingly, the Department of Justice has endorsed Dr. Adams as an expert on policing. For example, in 2023, the National Institute of Justice, the research, development and evaluation of the Department's Office of Justice Programs, named Dr. Adams as a Law Enforcement Advancing Data and Science Academic Scholar. *Meet the LEADS Scholarship Recipients: Ian T. Adams, Ph.D.*, Nat'l Inst. of Just., U.S. Dep't of Just. (2023), https://nij.ojp.gov/funding/leads-scholar-biographies?page=1#biographies-biographies-by-role-jahabkoo-pk3zgwf. And in 2022, Dr. Adams participated in a U.S. Department of Justice Office of Legal Policy publication, where he was identified as a "criminal justice scholar[] with expertise in body-worn cameras and law enforcement use of force." U.S. Dep't of Just., *The Report of the Department of Justice Pursuant to Section 13(c) of Executive Order 14074: Officer Review of Body-Worn Camera Recordings After an Incident Involving the Use of Force* (2024), https://www.justice.gov/olp/media/1384336/dl.

necessarily contain a federal "component." *See Mesa*, 489 at 127-28 (explaining that if a federal officer can claim self-defense without "depend[ing] on [a] federal . . . law[], then the self-defense claim is not a federal defense).

### C. A generalized claim to have a defense heard in federal court is not sufficient to establish a colorable federal defense.

At bottom, the defendant falls back on the claim that he is entitled to have his defenses heard in federal court and that the standard is not demanding because he does not have to "win his case before he can have it removed." ECF No. 75 at 22 (citing *Jefferson Cnty.*, 527 U.S. at 431). Although the defendant need not prevail on a particular federal defense at this stage, he must at least advance a defense with a basis in federal law that is "colorable," *Mesa*, 489 U.S. at 129, or "plausible." *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001). For example, in *Mesa*, the Supreme Court "decline[d] to divorce the federal official immunity defense from the pleadings required to allege it," which would "transform those pleading requirements into an independent basis for jurisdiction." 489 U.S. at 133. In other words, it is not enough—as the defendant has done here—for a federal officer merely to plead a federal defense to overcome the presumption that states regulate the crimes occurring within their borders. *Manypenny*, 451 U.S. at 243. The defendant must make a colorable claim that a specific federal defense applies to his charged conduct. And that the defendant has not done.

## IV. The defendant's bias claim lacks merit.

Pivoting away from the well-established test for removal, the defendant purports to invoke (ECF No. 75 at 24) the removal statute's "intent" as a ground for removing his case to federal court. Specifically, the defendant argues that pervasive bias on the part of Hennepin County

Attorney, Mary Moriarty, counsels in favor of removal here. That argument falls short in several ways.

First, as the defendant himself recognizes, the principal bias-related concern against which the removal statute has safeguarded is "interference by hostile state *courts*." *Id.* (citing *Watson v. Philip Morris Companies, Inc.*, 551 U.S. 142, 147-48 (2007)) (emphasis added); *see id.* at 148 (noting Daniel Webster's explanation that the removal statute would provide a forum for federal officers "where state courts might prove hostile to federal law"). Even assuming the statements on which the defendant relies evince hostility—and that is incorrect, as explained below—not a single one of them is attributable to a state court. Indeed, the defendant provides not one whit of evidence that he would likely face hostility from a state court if this case were not removed to a federal forum.[3]

Second, the statements on which the defendant relies are not indicative of bias against federal immigration enforcement. Despite collecting several statements from a publicly elected official who is regularly communicating about her job with her constituents, the defendant advances only three claims of bias. *See* ECF No. 75 at 26. None holds up. He faults Moriarty for declining to cooperate with federal immigration officials. But it has long been the law that the federal government may not commandeer state and local officials to carry out federal policy, *see Printz v. United States*, 521 U.S. 898, 935 (1997), including immigration policy, *see, e.g.*, *United States v. Minnesota*, 840 F. Supp. 3d 1270, 1294-95 (D. Minn. 2026) (listing cases); *United States v. Illinois*, 796 F. Supp. 3d 494, 523-35 (N.D. Ill. 2025). Next, the defendant highlights Moriarty's

[3] The defendant's suggestion (ECF No. 75 at 27) that the Supreme Court, in *Chevron v. Plaquemines Parish*, *supra*, "favorably cited" an amicus brief that identified federal immigration enforcement as an area where removal may be warranted is inaccurate. That case, which involved the propriety of removal for a company that refined aviation gas during the Second World War, *see* 608 U.S. at 5-6, has no bearing on the bias argument that the defendant advances.

statements about racial profiling in ICE enforcement. But surely the defendant does not claim that racial profiling is permissible; presumably he means, in the face of considerable evidence to the contrary,[4] that Moriarty was wrong to suggest that ICE has engaged in racial profiling when carrying out its immigration work. Finally, he faults Moriarty for describing efforts by Minnesotans to resist ICE efforts at intimidation and for referring to the ICE presence in Hennepin County as an "occupation." ECF No. 75 at 26. But urging Minnesotans to push back against

[4] *See, e.g.*, *Hussen v. Noem*, 822 F. Supp. 3d 944, 994 (D. Minn. 2026) ("I conclude that Plaintiffs have made a clear showing that Defendants have adopted a policy authorizing federal immigration officers to conduct investigatory stops based on ethnicity or race without reasonable suspicion that the individuals were violating immigration laws. The evidence from individual encounters is compelling and troubling."); *Pedro Vasquez Perdomo v. Markwayne Mullin*, No. 2:25-CV-05605-MEMF-SP, 2026 WL 3267125, at *1 (C.D. Cal. Oct. 23, 2026) ("[T]his Court finds that—at this stage, the organizations and individuals have shown that they will likely be able to prove the Government does have a policy in the Los Angeles area of stopping people for immigration purposes just because they look Latino or because they look Latino and working class."); *see also* Sarah Nelson, *Minnesotans Testify in Federal Court About Racial Profiling by ICE Agents*, Minnesota Star Tribune (Feb. 18, 2026), https://www.startribune.com/minnesotans-testify-in-federal-court-about-racial-profiling-by-ice-agents/601583988.; Melissa Hellmann, *'It's Like They're Hunting': U.S. Citizens and Legal Residents Report Increase in Racial Profiling by ICE*, The Guardian (Jan. 22, 2026), https://www.theguardian.com/us-news/2026/jan/22/us-citizens-racial-profiling-ice.; Sofia Barnett & Rohan Preston, *Allegations of Racial Profiling of U.S. Citizens on the Rise as ICE Surge Expands in Minnesota*, Minnesota Star Tribune (Jan. 18, 2026), https://www.startribune.com/allegations-of-racial-profiling-of-us-citizens-on-the-rise-as-ice-surge-expands-in-minnesota/601564653.; Emmy Martin, Sofia Barnett & Louis Krauss, *Racial Profiling Concerns Grow as ICE Expands Presence in Twin Cities*, Minnesota Star Tribune (Dec. 18, 2025), https://www.startribune.com/racial-profiling-concerns-grow-as-ice-expands-presence-in-twin-cities/601545116.; Brittny Mejia, *Immigration Agents Used Slurs When Referring to Latinos in Text Messages, Video Obtained by ACLU*, L.A. Times (July 27, 2026), https://www.latimes.com/california/story/2026-07-27/immigration-agents-racial-profiling-aclu.; Zurie Pope, *Latino Neighborhoods Overwhelmingly Targeted in Immigration Raids, Rights Group Says*, L.A. Times (July 22, 2025), https://www.latimes.com/california/story/2025-07-22/data-shows-evidence-of-racial-profiling-in-ice-raids-immigrant-rights-group-says.; Russell Contreras, *ICE Accused of Racial Profiling in Detentions of Latino U.S. Citizens*, Axios (July 9, 2025), https://www.axios.com/2025/07/09/ice-us-citizens-detention-racial-profiling.; Brittny Mejia & Rachel Uranga, *Fears of Racial Profiling Rise as Border Patrol Conducts 'Roving Patrols,' Detains U.S. Citizens*, L.A. Times (June 15, 2025), https://www.latimes.com/california/story/2025-06-15/latinos-targeted-in-raids-u-s-citizens-detained-indiscriminate-sweeps-home-depot-lots-targeted.

efforts to intimidate or describing, accurately, a significant surge of federal immigration officers to Minneapolis as tantamount to an occupation does not prejudge how state prosecutorial resources will be deployed or imply that the Hennepin County Attorney's Office is biased against lawful federal immigration enforcement.

Indeed, Moriarty's statements show no more bias than statements made by members of this Court about the deployment of federal immigration officers into the state of Minnesota for and during Operation Metro Surge. *See, e.g.*, *Advocs. for Hum. Rts. v. U.S. Dep't of Homeland Sec.*, 820 F. Supp. 3d 789, 809 (D. Minn. 2026) (explaining, regarding the government's treatment of immigration detainees, that "[T]he Constitution does not permit the government to arrest thousands of individuals and then disregard their constitutional rights because it would be too challenging to honor those rights," and further noting that "[d]ue process is not a game of keep-away"); *Minnesota v. Noem*, 818 F. Supp. 3d 1030, 1048 (D. Minn. 2026) ("Plaintiffs have made a strong showing that Operation Metro Surge has had, and will likely continue to have, profound and even heartbreaking, consequences on the State of Minnesota, the Twin Cities, and Minnesotans. . . . It would be difficult to overstate the effect this operation is having on the citizens of Minnesota[.]"); *U.H.A. v. Bondi*, 822 F. Supp. 3d 1007, 1020 (D. Minn. 2026), *opinion vacated, appeal dismissed sub nom. U.H.A. v. Blanche*, No. 26-1482, 2026 WL 2718462 (8th Cir. Apr. 21, 2026) (explaining that government's immigration policy "turns the refugees' American Dream into a dystopian nightmare"); *Rigoberto S. J. v. Bondi,* 830 F. Supp. 3d 882, 885 (D. Minn. 2026) ("But since the beginning of Operation Metro Surge, the Government has offered that excuse to this Court again, and again, and again (and to other judges in this district again, and again, and again, and again, and again, and again) to excuse its oversights and disobedience of court orders in immigration habeas cases."); *Darvin M. v. Bondi*, 817 F. Supp. 3d 740, 749 (D. Minn. 2026) (describing

immigration enforcement actions as "Orwellian"); *Juan T.R. v. Noem*, No. 26-cv-0107, 2026 WL 232015, at *1 (D. Minn. Jan. 28, 2026) ("ICE has likely violated more court orders in January 2026 than some federal agencies have violated in their entire existence."); *Lah v. Bondi*, No. CV 26-00171(MJD/SGE), 2026 WL 184529, at *2 (D. Minn. Jan. 23, 2026) (describing federal immigration officers' conduct as "particularly craven"); Mattathias Schwartz, *Trump's Minnesota Surge Threatened Democracy, Judge Warns*, N.Y. Times (Sep. 17, 2026), https://www.nytimes.com/2026/09/17/us/politics/minnesota-judge-trump-immigration.html ("What happened in Minnesota's federal court, [Judge Patrick J. Schiltz] said, 'created a grave threat to the rule of law.'").

Similarly, Moriarty's concerns regarding racial profiling by ICE agents, as well as her concerns that federal immigration enforcement would hamper the work of courts in Minnesota, are concerns that Judges on this Court have voiced. *See, e.g.*, *Hussen v. Noem*, 822 F. Supp. 3d 944, 994 (D. Minn. 2026) ("I conclude that Plaintiffs have made a clear showing that Defendants have adopted a policy authorizing federal immigration officers to conduct investigatory stops based on ethnicity or race without reasonable suspicion that the individuals were violating immigration laws."); Jeremy Roebuck, *U.S. judge orders ICE chief to appear in court, threatens contempt ruling*, Wash. Post (Jan. 27, 2026), https://www.washingtonpost.com/national-security/2026/01/27/ice-federal-judge-contempt/ ("'It's put a tremendous burden on our court staff and on lawyers,' U.S. District Judge Eric Tostrud, a Trump appointee, said at a court hearing Monday in St. Paul. 'They've been asked to respond or prepare filings on remarkably short timetables. Our court staff has essentially been working around-the-clock.'"). Moriarty's statements regarding ICE operations within Hennepin County conform with beliefs widely held by this Court, and for good reason: Operation Metro Surge resulted in chaos, an overwhelming

amount of work for this Court, its staff, and attorneys throughout the city of Minneapolis, and the deaths of two U.S. citizens. As the chief law enforcement officer for Hennepin County, Moriarty is not biased against ICE agents or any federal officers; her previous statements simply reflect the facts on the ground.

Third, even assuming—incorrectly—that Morarity's statements could be interpreted as expressing bias against federal immigration efforts generally or in Minnesota, none of those statements bears any connection to the defendant or his case. Nor does the defendant argue to the contrary. And to the extent the defendant worries that any such comments would affect his ability to receive a fair trial, the voir dire process will ensure the impartial jury to which he is constitutionally entitled. *See Skilling v. United States*, 561 U.S. 358, 378-81 (2010). There is thus no need or basis for removing this state prosecution from the state court where it belongs.

The defendant also claims (ECF No. 75 at 26) that Moriarty's "motives had nothing to do with [his] actions and everything to do with" her prejudice against federal immigration officers. The data make clear that that claim is wrong. This case has nothing to do with prejudice or bias and everything to do with the defendant's actions. Far from unique, the defendant is—sadly—simply one of many cases in which the State of Minnesota (in Hennepin County and elsewhere) has prosecuted a defendant for brandishing a weapon at other motorists while on the road. *See* Ex. A (collecting cases).

**CONCLUSION**

For the foregoing reasons and those provided in the State's post-hearing brief on removal, the Court should remand this prosecution to the district court for Hennepin County.

Dated: November 19, 2026

Respectfully Submitted,

MARY F. MORIARTY
Hennepin County Attorney

<u>/s/ *Morgan D. Kunz*</u>
MORGAN D. KUNZ
JOSHUA R. LARSON
HENNEPIN COUNTY ATTORNEY'S OFFICE
300 S. 6th St.
Minneapolis, MN 55487
(612) 348-5550
Morgan.Kunz@hennepin.us

<u>*/s/ James I. Pearce*</u>
JAMES I. PEARCE* (D.C. Bar No. 90042280)
WASHINGTON LITIGATION GROUP
1717 K Street NW
Washington, DC 20006
(202) 521-8750
jpearce@washingtonlitigationgroup.org

*Counsel for State of Minnesota*

* *Pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 19, 2026, a true and accurate copy of the State of Minnesota's Response to Defendant's and the United States' Post-hearing Briefs Concerning Removal was filed electronically with the Court's CM/ECF filing system, which will then send notification of such filing to the parties, including:

RYAN M. PACYGA
Ryan Pacyga Criminal Defense
860 Blue Gentian Road
Suite 175
Eagan, MN 55121
612-339-5844
ryan@arrestedmn.com

*Attorney for Defendant*

This 19th day of November, 2026.

*//s/ James I. Pearce*
JAMES I. PEARCE
WASHINGTON LITIGATION GROUP
1717 K Street NW
Washington, DC 20006
(202) 521-8750
jpearce@washingtonlitigationgroup.org