**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| State of Minnesota,<br><br>Plaintiff,<br><br>v.<br><br>Gregory Donnell Morgan, Jr.,<br><br>Defendant. | Case No. 26-CR-112 (NEB)<br><br>**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF REMOVAL** |

## INTRODUCTION

The State's briefs ask this Court to try the case. In the last ten pages of its post-hearing brief (Doc. 74) ("State Br."), the State weighs the options Agent Morgan had on a highway shoulder, second-guesses his tactics from the vantage of a video, measures his conduct against the "generally accepted" practices described by a retained expert, and grades the credibility of an ICE trainer. Its response to the defense and United States briefs (Doc. 78) ("State Resp.") goes further, asking the Court to find Agent Morgan incredible on a record in which the State's two complaining witnesses invoked the Fifth Amendment rather than face cross-examination. Those are the questions Agent Morgan's federal defenses will put to the finder of fact. Section 1442 exists so that a federal forum answers them. The only questions now are whether the charged act is "for or relating to" an act under color of federal office, and whether his federal defenses are colorable.

On those questions the State's own brief concedes nearly everything that matters. It concedes that Agent Morgan is a federal officer, that he was on duty, that he was driving to base on a direct order, that the Cadillac driver twice moved onto the shoulder to slow him, that he had to brake sharply, that he could not see inside the Cadillac. What remains is a dispute about how to characterize the Cadillac driver's conduct and whether Agent Morgan's response was reasonable. That is a merits dispute. It belongs in the forum Congress chose for it.

The State errs in three ways. First, on prong two, it applies a "required" or "causal" test that Congress retired in 2011 and that the Supreme Court has now rejected. Second, on prong three it argues the validity of Agent Morgan's defense, not its plausibility. Third, its response asks the Court to abandon the standard this Court has already adopted and to find the officer incredible on a one-sided record, and its belated answers on *In re Neagle*, self-defense and defense of others as independent federal defenses, and the local bias record do not withstand scrutiny. The Court should deny remand and confirm jurisdiction.

## ARGUMENT

### I. The State Concedes the Facts That Decide Removal and Applies the Wrong Standard to the Rest.

#### A. The State's own brief supplies the jurisdictional facts.

Drawn from the State's post-hearing brief alone, the following is uncontested:

- Agent Morgan is a federal officer. State Br. 27 n.5.
- He was on duty and driving to the base "as he had been ordered to do." State Br. at 27. The order was to leave the second distress-call location "quickly, but safely." *Id.* at 30; *see id.* at 6 (agents ordered to leave "quickly and safely").
- T.B., the Cadillac driver, twice moved the Cadillac across the white line toward the shoulder to slow Agent Morgan down. *Id.* at 8. The second time, Agent Morgan "had to brake sharply." *Id.* at 9.
- The Cadillac's windows were tinted, and Agent Morgan could not see who was inside. *Id.* at 11.
- Agent Morgan shouted "Police, back off, police back off" and held his weapon in the low-ready position. *Id.* at 10. The State accepts that the height difference between the two vehicles "likely accounted for" T.B.'s impression that the gun was pointed at him. *Id.* at 10-11.
- T.B. "could not hear anything" Agent Morgan said through the Cadillac's closed windows. *Id.* at 10.
- Agent Morgan then returned to base and remained on duty for roughly two more hours. *Id.* at 11.

The State's opening brief was as notable for what it left out. It did not address *Neagle*, *Willingham*, self-defense and defense of others as independent federal defenses, or the County Attorney's public statements. The State's

response now takes up each of those points, and Agent Morgan answers them below. But the response does not retract any of the concessions listed above. Instead, it asks the Court to disregard the standard the Court has already adopted and to find Agent Morgan incredible. Neither request has merit.

The State also characterizes the evidence in ways its own exhibits do not support. Its Introduction asserts that the Cadillac driver was "entirely unaware" that Agent Morgan was an ICE agent.[1] State Br. 1. The response repeats the theme, calling Agent Morgan's concern that the occupants knew he was an ICE agent an "apparent (and unreasonable) assumption." State Resp. 6. But the driver told investigators he "got the ICE vibe from him at first," Ex. 17 at 6:235–37; Def. Ex. 63 at 4, 6, and suggested the occupants were "those who won't be named." Ex. 15 at 10:449–53. The State calls the driver and his passenger "the Victims" throughout both briefs. That label assumes the conclusion the State needs. To Agent Morgan and his partner, they were attackers.[2]

---

[1] Defendant preserves his objection to the Court's ruling which permitted the two complaining witnesses, who had both been subpoenaed by the Defense for the evidentiary hearing, to avoid testifying and granting blanket Fifth Amendment protection to both of them without any permitted inquiry from the Defense. This raises serious reliability concerns, especially when the State asks the Court to adopt the discovery statements of the complaining witnesses without having to face the time-honored test of cross-examination. *See* Part I.C, *infra*.

[2] The State's record characterizations should be tested against its own sources. For example, the State repeatedly says Agent Morgan "pointed" his firearm. Agent Codner, on whom the State relies, described the "low ready" position, with the weapon "out" and angled across the driver's side window. State Br. 10 (citing Tr. 122–24). The State itself acknowledges that the height difference between the two vehicles "likely accounted for" T.B.'s perception that the weapon was pointed at him. *Id.* at 10-11. T.B. said that he could not tell whether the gun was actually pointed at him. U.S. Br. 4 n.2 (citing Ex. 15 at 8:335-49).

**B. The standard is plausibility, and the State's own brief says so.**

The State correctly recites that a federal defense is "colorable" if it is "plausible." State Br. 26 (citing *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001)). It then spends ten pages arguing implausibility on evidence it asks the Court to weigh. The Supreme Court has said the opposite. A court does not "require the officer virtually to 'win his case before he can have it removed.'" *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999); *accord Jacks v. Meridian Res. Co.*, 701 F.3d 1224, 1235 (8th Cir. 2012). The removal test is "broader, not narrower, than the test for official immunity." *Willingham v. Morgan*, 395 U.S. 402, 405 (1969). And this Court has already held that in evaluating removal, it "must credit the defendants' theory of the case." Doc. 53 at 2; *see Griffin v. Optum, Inc.*, 175 F.4th 897, 902 (8th Cir. 2026) (citing *Acker*, 527 U.S. at 432).

The State also claims that Agent Morgan "bears the burden of establishing federal jurisdiction by a preponderance of the evidence." State Br. at 26. That overstates what is required. First, as the law of this Circuit and the Supreme Court make clear, Agent Morgan need only make a "plausible" showing for removal. See *United States v. Todd*, 245 F.3d 691, 693 (8th Cir. 2001) (citing *Willingham*, 395 U.S. at 406-07). The State's own brief acknowledges this standard. State Br. at 26. Second, the case the State cites for this proposition, *In re Prempro Prods. Liab. Litig.*, 591 F.3d 613, 620 (8th Cir. 2010), has nothing to do with removal of state criminal prosecutions under 28 U.S.C. § 1442. Rather, the quoted

language is ripped from a case dealing with removal under an entirely different theory, civil diversity jurisdiction, which is founded on a wholly different federal statute, 28 U.S.C. § 1332. The *Prempro* standard does not apply to this criminal case grounded in federal officer removal.

The State's citation to *Georgia v. Meadows*, 88 F.4th 1331, 1348 (11th Cir. 2023), for the proposition that the Court may weigh demeanor and credibility does not help it here. Even on the State's reading, any credibility finding goes to the jurisdictional facts, not to whether the defense will prevail. And no jurisdictional fact is genuinely in dispute. The State's attacks on credibility are collateral: whether Agent Codner's statement to troopers about cars following them was accurate (State Br. 8), whether "TDY" means 24-hour availability (*id.* at 3 n.1), and whether the return to base was to "regroup" or to refuel (State Br. at 30-31 n.6). The State itself concedes the last is "not material." *Id.* at 31 n.6. The material facts rest on the video (Ex. 9), the Cadillac driver's own statements, and the State's own concessions, not on Agent Morgan's credibility.[3]

Nor does the "strong judicial policy against federal interference with state criminal proceedings" settle anything. State Br. 25 (quoting *Mesa*, 489 U.S. at 138). That policy is already built into the statute's requirements, as the United States

[3]The State also notes that, at a prior stage, Agent Codner told troopers that cars were following them and later acknowledged that statement was inaccurate in light of the video. State Br. 8 (citing Tr. 118). That statement concerned why Agent Morgan did not slow down. It has no bearing on the Cadillac driver's conduct, which the State concedes, or on jurisdiction.

explains. U.S. Br. (Doc. 77) at 3 n.1. The same case law holds that § 1442 exists to "ensure a federal forum in any case where a federal official is entitled to raise a defense arising out of his official duties." *Arizona v. Manypenny*, 451 U.S. 232, 241 (1981). In *Mesa*, the postal workers had raised no colorable federal defense at all. 489 U.S. at 124, 129. That is the opposite of this case.

### C. The State's credibility attack cannot substitute for the plausibility standard.

The State's response asks the Court to set aside the standard it has already adopted. It argues that *Acker* requires a court to credit only a defendant's reading of a disputed legal authority, not his account of disputed facts. State Resp. 2–4 (citing *Meadows*, 88 F.4th at 1346). That argument cannot be squared with Doc. 53, which is the law of this case, or with *Griffin*, which binds this Court. *Meadows* does not. Nor do the State's out-of-circuit authorities help it on their own terms. In each, the question was whether the charged conduct was official at all: whether a former White House chief of staff's alleged role in efforts to overturn a state's election results fell within his office and claimed "unfettered authority," *Meadows*, 88 F.4th at 1346–48 (finding theory of case not plausible); whether payments the court found to be "a purely personal item" related to the presidency, *New York v. Trump*, 683 F. Supp. 3d 334, 345 (S.D.N.Y. 2023); and whether a defendant's "vague and uncertain assertions" showed any official connection, *Georgia v. Clark*, 2023 WL 7012663, at *8 (N.D. Ga. Sept. 29, 2023).

Here, no one disputes that Agent Morgan was an on-duty federal officer driving his duty vehicle under a supervisor's order. What the State disputes is whether the Cadillac posed a threat and whether Agent Morgan's response was reasonable. Those are the merits of his federal defenses, and that is exactly where *Acker* forbids requiring the officer "to 'win his case before he can have it removed.'" 527 U.S. at 431.

The State's credibility attack also rests on a record of its own making. Agent Morgan testified and was cross-examined. The two complaining witnesses, both subpoenaed by the defense, invoked the Fifth Amendment and did not testify. *See supra* n.1. The State nonetheless asks the Court to accept its characterization of their conduct—that the driver merely tried "to slow him down by briefly moving to cut him off"—over Agent Morgan's sworn account. State Resp. 6. To the extent the driver's out-of-court statements matter at this stage, they matter as admissions: that he "got the ICE vibe," that he "made the not so bright decision to try to stop" Agent Morgan's vehicle, and that he stayed on Agent Morgan's "tail" while "carrying as well." Def. Ex. 63 at 1, 4, 6; Def. Ex. 61 at 3, 8. A one-sided credibility contest is not a basis for denying a federal forum.

The particular points the State raises do not change the analysis. First, whether Agent Morgan was on the shoulder goes to his driving, not the Cadillac driver's. State Resp. 4–5. No one contends that a private motorist may use a

moving car to block or brake-check another vehicle at highway speed, whatever lane that vehicle is in. Second, the State's assertion that Agent Morgan displayed his weapon "because he was angry and wished to scare or intimidate" the occupants, *id.* at 5, cites no testimony. Agent Morgan shouted "Police, back off," and the State has already accepted that the height difference between the vehicles "likely accounted for" the driver's impression that the weapon was pointed at him. State Br. 10–11. Third, variations in how a witness re-enacts a weapon position from the witness stand, months later, are matters for cross-examination at trial; they do not render a defense implausible. And the State's claim that Agent Morgan's testimony on this point "contradicted" Agent Codner's cites pages of Agent Morgan's own testimony, not Agent Codner's. State Resp. 5 (citing Tr. 350–51). Fourth, the State says Agent Morgan's account of an attack is "contradicted by the video evidence," *id.* at 11, but never cites the video, which shows two swerves into Agent Morgan's path, with braking on the second. Ex. 9 at 00:05–00:09.

## II. The Charged Conduct Is "For or Relating To" an Act Under Color of Federal Office.

### A. The State errantly applies a causal nexus test that Congress retired.

The State's prong-two argument is that Agent Morgan's federal duties did not "require" him to display his weapon at a motorist. State Br. 28 (quoting *Illinois v. Zidek*, 691 F. Supp. 1177, 1178 (N.D. Ill. 1988)); *id.* at 31 (duty "did not

require, nor even permit," the charged conduct, (quoting *Georgia v. Waller*, 660 F. Supp. 952, 954 (M.D. Ga. 1987))). It insists there be "no causal connection." *Id.* That the State cites to *Zidek* is telling of its desperation. In *Zidek*, a district court rejected an IRS agent's claim that his federal duties required him to drive drunk while purportedly investigating exotic dancers, all while his own supervisor was unaware of and did not authorize the purported "investigation." In other words, an IRS agent decided to go to strip clubs, get drunk, drive, and then threw up a Hail Mary to try to save his own personal conduct. This is a far cry from the facts of our case. Moreover, the test of *Zidek* (1988), *Waller* (1987), *Naas v. Mitchell*, 233 F. Supp. 414 (D. Md. 1964), *Galbert v. Shivley*, 186 F. Supp. 150 (W.D. Ark. 1960), *Fink v. Gerrish*, 149 F. Supp. 915 (S.D.N.Y. 1957), and *Minnesota v. Weber*, 589 F. Supp. 2d 1170 (D. Minn. 2008), all apply a different standard than what the law now requires. Every one of those decisions pre-dates the 2011 Removal Clarification Act, which replaced a "strict causal relationship" with the broader words "for or relating to." *Chevron USA Inc. v. Plaquemines Par.*, 608 U.S. 1, 11, 146 S. Ct. 1052, 1060 (2026); Doc. 75 at 14.

*Plaquemines* is the Supreme Court's most recent word, and it forecloses the State's framework:

> The phrase "relating to" sweeps broadly. . . . One thing can relate to another even if the connection is "indirect." . . . And, one thing can relate to another even without a "strict causal relationship." Accordingly, a removing defendant need not show that his federal duties

> specifically required or strictly caused the challenged conduct.

146 S. Ct. at 1060 (citations omitted). The Court added that "relating to" does not require that the federal duties "specifically invited" the conduct, and that an act can relate to its consequences "even when the causal chain includes actions by intermediaries." *Id.* at 1062. The State quotes only the end of the test, that the connection not be "tenuous, remote, or peripheral," State Br. 27 (quoting 608 U.S. at 12), and then applies the old standard in its place.

The State's reliance on *Maryland v. Soper* (*Soper II*), 270 U.S. 36 (1926), is also misplaced. The State quotes *Soper II* for the proposition that the charged acts must be "closely connected with, and included in," the enforcement of federal law. State Br. 28-29. But the State omits that "removals of prosecution on account of acts done in enforcement of (the federal laws) or under color of them properly include those for acts committed by a federal officer in defense of his life, threatened while enforcing or attempting to enforce the law. Such acts of defense are really part of the exercise of his official authority. They are necessary to make the enforcement effective." *Soper II* at 42.

The State's response leans on the same superseded framework. It quotes *Maryland v. Soper* (No. 1), 270 U.S. 9, 35 (1926), for the proposition that an officer must "negative the possibility that [he was] doing other acts than official acts," and cites *Colorado v. Symes*, 286 U.S. 510, 520 (1932). State Resp. 10. But *Soper* (No.

1) is the source of the "causal connection" test, *see Mesa*, 489 U.S. at 131–32, and that strict causal requirement is precisely what Congress displaced in 2011 and what *Plaquemines* has now confirmed is no longer the law. 608 U.S. at 11. Nor does *Willingham*'s footnote help the State. The Court said only that "a more detailed showing might be necessary" in a criminal case. 395 U.S. at 409 n.4. Agent Morgan made a detailed showing at a full evidentiary hearing under 28 U.S.C. § 1455(b): his own testimony, his partner's testimony, the video, and the agency's written policies. That is far more than the bare averment of on-duty status the State describes.

### B. The charged act is a defensive display of a weapon by an on-duty officer under orders. It is not a traffic offense.

Much of the State's argument is aimed at conduct Agent Morgan is not charged with and does not claim authority to perform. The State says ICE officers may not stop cars based on local traffic laws, may not make arrests without suspicion of an immigration violation, and may not fire from moving vehicles. State Br. 29-30. Agent Morgan did none of those things. He did not stop the Cadillac, did not arrest anyone, and did not fire. He is charged with a single act: displaying his service weapon in the low-ready position while shouting "Police, back off," after a car cut him off twice, and brake checked hard, at highway speed. *See id.* at 25.

The relationship between that act and Agent Morgan's federal office is not "tenuous, remote, or peripheral." He was on duty on Operation Metro Surge. He was in Minnesota on a federal assignment. He was driving the SUV his team had been ordered to use, with his ICE partner working in the SUV with him, on a direct order to leave a hostile scene. He was responding to what he perceived as an attack on two federal agents and their duty vehicle, one that came after another driver had tried to block him earlier that day and after a protester at the second scene threatened to kill him while others threw things. Tr. 333-36, 340-44, 453. *Plaquemines* held that a connection of this kind need not be exclusive or direct. The charged act arose from the performance of federal duty, and the State's own concessions place it in that setting. State Br. 27.

The State also says that the drive back to base was not itself an act under color of office, citing *Galbert* and *Naas*, both pre-2011 negligence suits over driving. *Id.* at 31. But those cases treated routine driving as the act at issue. Here the act is a use-of-force decision that DHS and ICE policy expressly regulate and authorize. *See* Ex. 22 at 4 (authorizing "any available object or technique" "[i]n an exigent situation, for self-defense or the defense of another"); Ex. 23 at 7. An officer who responds to a perceived assault by displaying a weapon is exercising law-enforcement authority, even when the underlying drive was routine. *Weber* is no closer: it involved a careless-driving charge after a fatal collision, not the

display of a weapon in response to a perceived assault, and it was decided before *Plaquemines* and the 2011 amendment.

Nor does it matter that Agent Morgan was not pursuing an immigration target at that moment. State Br. 29–30. Section 1442(a)(1) reaches "for or relating to any act under color of" federal office, not only acts of the officer's principal specialty. In any event, the federal statute authorizing ICE officers to arrest for offenses committed in their presence requires that the officer be "performing duties relating to the enforcement of the immigration laws at the time of the arrest." 8 U.S.C. § 1357(a)(5). The State twice paraphrases that language as requiring that the officer be "engaged in immigration enforcement at the time of the offense." State Br. 29; *see* U.S. Br. 17 n.6. Agent Morgan was performing duties relating to immigration enforcement. He was under a supervisor's order and remained on duty for about two more hours, as the State acknowledges. State Br. 11.

### C. Section 1442(c) independently deems Agent Morgan to have acted under color of his office.

Subsection (c) provides that, "[s]olely for purposes of determining the propriety of removal," a law enforcement officer is "deemed to have been acting under the color of his office" if he "protected an individual in the presence of the officer from a crime of violence" or "provided immediate assistance to an

individual who suffered, or who was threatened with, bodily harm." 28 U.S.C. § 1442(c)(1)-(2). The State offers four responses. None succeeds.

*First*, the State says the only person in Agent Morgan's presence was Agent Codner, and Agent Codner was not threatened. State Br. 32. The statute says "an individual in the presence of the officer." It is not limited to a partner, and it plainly reaches the other motorists on the highway whose safety Agent Morgan testified he feared for. Doc. 72 at 343-44. Agent Morgan's own safety is also at issue. And Agent Codner testified that, in his view, a third swerve was possible. Tr. 76:4-14.

*Second*, the State argues that the Cadillac driver committed no crime of violence because he did not use the car as a "deadly or dangerous weapon" under § 111(b). State Br. 33–34. Section 1442(c) asks whether the officer "protected" someone from a crime of violence, and the State's own authority identifies the governing question for a car: whether it was used in a manner "capable of causing serious bodily injury or death." *Id.* at 33-34 (quoting *United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002), and *United States v. Wallace*, 852 F.3d 778, 783 (8th Cir. 2017)). That is a fact-bound inquiry, and on the facts the Court must credit, the answer is yes. Agent Morgan testified that the second swerve, with hard braking, brought him "inches away" from a collision on a busy highway. Tr. 343-44, 354. The video shows two targeted swerves, with braking in the second. Ex. 9 at 00:05-00:09. The driver admitted he "made the not

so bright decision to try to stop" Agent Morgan's vehicle and was trying to "cut him off." Def. Ex. 63 at 1; Def. Ex. 61 at 2. A driver who intentionally cuts across a lane and brakes hard in front of a vehicle at highway speed to stop it is at minimum plausibly using his car in a manner capable of causing serious injury. The State's cases are collisions and near-collisions with officers, State Br. 34 n.8, and none holds that a defendant must succeed in causing a collision before the car is a weapon. In its brief, the State describes the same events as T.B. "briefly veering" and a "brake check." That is the State's inference from the same video. At this stage, it is not the one the Court draws.

The statute does not limit "crime of violence" to federal offenses either. It incorporates the definition in 18 U.S.C. § 16, 28 U.S.C. § 1442(d)(2), and the State has charged Agent Morgan with second-degree assault with a dangerous weapon under Minnesota law for displaying a firearm, State Br. 25. The driver of the Cadillac is held to the same standard: whether his conduct, under state or federal law, amounts to a crime of violence. The Cadillac driver's conduct amounted to the "use, attempted use, or threatened use of physical force" against Agent Morgan and his partner. 18 U.S.C. § 16. *U.S. v. Aragon-Ruiz*, 551 F.Supp.2d 904, 926 (D. Minn. 2008) (second degree assault under Minn. Stat. § 609.222 subd. 1 is "crime of violence"). The State cannot comfortably maintain that the threatened use of a gun is a felony assault but that a deliberate swerve and brake check into a federal vehicle at highway speed is not a threatened use of force.

*Third*, the State argues that the Cadillac driver's "supposed crime was complete" by the time Agent Morgan displayed his weapon, because he could have merged behind or driven ahead. State Br. 35. The statute does not ask whether the offense had technically ended. It asks whether the officer protected someone from it. A reasonable officer in Agent Morgan's position would not have thought the threat over. The Cadillac had swerved twice, and its driver's conduct was *escalating*, not deescalating. Agent Morgan could not see who was inside. He did not know whether the Cadillac was part of the group that had followed him from the previous scene. Doc. 72 at 341, 343, 453. Agent Codner agreed a third swerve was possible. Tr. 76:4-14. The driver himself later said he stayed on Agent Morgan's "tail" and was "carrying as well." Def. Ex. 61 at 3, 8. And the State's alternatives—merging behind, passing ahead—are the hindsight analysis that *Graham v. Connor*, 490 U.S. 386, 396 (1989), expressly forbids. They also ignore Agent Morgan's testimony that he feared being boxed in, feared further brake checks, and could not stop on the highway. Tr. 345, 355-56. Under the agency's own policy, the requirement that force be used only when no reasonably effective alternative exists "does not create a duty to retreat . . . or a continuum or checklist of alternative steps that must be tried before resorting to force." Ex. 23 at 1 n.1.

*Fourth*, the State says Agent Morgan did not "provide[] immediate assistance" to anyone. State Br. 32. That argument applies only to § 1442(c)(2).

Section 1442(c)(1) is separate, and Agent Morgan relies on both. At minimum, a defendant who credibly asserts that he protected his partner and the traveling public from a vehicle used as a weapon has satisfied § 1442(c)'s plausibility threshold. Subsection (c) addresses removal, not conviction, and it asks only for a plausible showing.

### D. The State's remaining prong-two points are immaterial.

The State suggests that the Court should discount Agent Morgan's testimony that he was returning to base to continue operations, because he told investigators the day after that he was returning to refuel "at the end of the day." State Br. 30-31 n.6. As noted, the State concedes this difference is not material. Refueling a team vehicle at the direction of a supervisor and returning to base to regroup are both federal duties. Either way, the State agrees Agent Morgan was ordered to return to base, remained on duty for two more hours, and was driving on Operation Metro Surge business. *Id.* at 11, 27.

The State's footnote on "TDY," *id.* at 3 n.1, relies on documents that are not in the hearing record, including a GSA order dated October 26, 2026, weeks after the hearing, and a TSA directive that does not govern ICE. The footnote also proves nothing relevant. Whether TDY means 24-hour availability or simply a temporary duty location, the State does not dispute that Agent Morgan was on duty at the time. Agent Morgan's showing under § 1442 does not depend on the definition of an acronym.

Finally, the State argues that traffic-related prosecutions require officers to show an "enforcement action or work-related emergency." State Br. 44 (citing *Weber*, *North Carolina v. Cisneros*, 947 F.2d 1135 (4th Cir. 1991), and *North Carolina v. Ivory*, 906 F.2d 999 (4th Cir. 1990)). For one, these cases are prosecutions for violations of state traffic laws. Second, these cases all arose prior to the "or relating to" the 2011 expansion of federal officer removal law. Third, removal failed in *Ivory* because the defendant had not alleged any colorable immunity defense; and *Cisneros* failed to qualify for removal because he could not establish exigency stemming from the duties of his federal employment, and therefore he could not avail himself of the immunity defense. *Cisneros*, 947 F.2d at 1140. Even on the State's framing, this record has both: a supervisor's order to extract from a hostile scene, and what Agent Morgan perceived as an emergency on the highway. Agent Morgan is not charged with violating a state traffic law. His exigency arose while he was driving, under color of and relating to his federal duties, and due to the Cadillac's felonious driving conduct. His colorable federal defenses include Supremacy Clause immunity, self-defense and defense of another federal officer, arising out of his duty to protect himself and his federal law enforcement partner.

## III. Agent Morgan Has Colorable Federal Defenses.

### A. Self-defense and defense of others are federal defenses on this record.

Agent Morgan's notice of removal identified self-defense, defense of others, and compliance with ICE policy as federal defenses, Doc. 1 at 8, he presented testimony about these defenses at the evidentiary hearing, and his opening memorandum explained why each supports jurisdiction. Doc. 75 at 22–23. The State's opening brief noted the listing, State Br. 35, but addressed only Supremacy Clause immunity. Its response now argues that self-defense is not a federal defense unless it "depend[s] on" federal law. State Resp. 14–15 (citing *Mesa*, 489 U.S. at 127–28). The State is wrong. *Mesa* explains that self-defense has two elements: that the act was, "in a legal sense, an act of self-defense," and that it was justified. 489 U.S. at 127. In *Tennessee v. Davis*, the first element "depended on a question of federal law"—whether the officer was carrying out a federal duty—and that federal question "provided the necessary predicate for removal." *Id.* at 127–28. So too here. Whether Agent Morgan was acting within his federal duties when the Cadillac swerved into his path, and whether the Cadillac driver's conduct was an assault on federal officers under 18 U.S.C. § 111, are questions of federal law. So is whether Agent Morgan's response was objectively reasonable under DHS's use-of-force policy, Ex. 22 at 4, and under the Fourth Amendment principles on which the State itself relies, State Br. 40–41. Those are

the "federal components" the State says it cannot find. State Resp. 14. Nor does the State explain why the Supreme Court's statement in *Mesa* that "acts of defense" by a federal officer are "part of the exercise of his official authority," 489 U.S. at 128, does not apply. It never explains why a federal officer's self-defense claim does not "implicate [] federal law" and "provide[] the necessary predicate for removal." *New York v. Tanella*, 239 F. Supp. 2d 291, 297 (E.D.N.Y. 2003) (quoting *Mesa*, 489 U.S. at 127); *see* U.S. Br. 12. And it never answers the United States' point that the parties dispute how federal law and policy apply to the Cadillac driver's conduct and Agent Morgan's response. U.S. Br. 11-12. Each of those disputes is a federal question. That is enough for removal.

The State's remaining response to the federal-law component of these defenses is its "likely counterarguments" section, State Br. 42-45, which addresses arguments Agent Morgan has not made in the form the State describes. Agent Morgan does not rest on his subjective belief alone. His belief is corroborated by video, by Agent Codner, by the Cadillac driver's own statements, and by the State's concessions.

The State's response also contends that Agent Morgan forfeited Supremacy Clause immunity by failing to develop it. State Resp. 12–13 (citing *Holschen v. Int'l Union of Painters & Allied Trades*, 598 F.3d 454, 467 (8th Cir. 2010)). *Holschen* concerns skeletal arguments in appellate briefs. It was a not a federal officer removal case. Its basic premise was that arguments not raised at the district court

are waived on appeal. It has nothing to say about a removal defense that Agent Morgan pleaded in his notice of removal, Doc. 1 at 8, asserted in his opening memorandum, Doc. 75 at 22–24, litigated at the evidentiary hearing, and that the United States has briefed in full, U.S. Br. 11–16.[4] The Court determines its jurisdiction on that whole record. And Agent Morgan addresses both elements of the defense, authorization and necessity, below.

### B. The conduct was "authorized by law."

The State argues that no statute authorized Agent Morgan to point a gun at a motorist, and that ICE's authority does not extend to "patrol[ling] the streets." State Br. 36. This again recasts the charge. The question is whether a federal officer on duty, under orders, accompanied by a federal partner, and under active attack, has authority under federal law to protect himself and his partner. *Neagle* says he does. There, the Court looked to the officer's duties under the laws of the United States and held that he was "authorized to resist the attack," "acting under the authority of the law of the United States." 135 U.S. at 76; *see id.* at 59-60. The State responds that *Neagle* rested on "positive law" that imposed a duty on the marshal. State Resp. 9. But no statute directed the marshal to guard Justice Field. The Court found the duty in "the general scope of his duties under the laws of the United States," which it held is itself "a law" for this

[4] Agent Morgan joins in, adopts and incorporates by reference the arguments made by the United States in its brief (Doc. 77) as well as its Statement of Interest (Doc. 26).

purpose. 135 U.S. at 59. Agent Morgan's duty to protect himself and his federal partner while carrying out his assignment arises from the same source. Congress, for its part, makes it a federal crime to assault, impede, or interfere with a federal officer engaged in his duties. 18 U.S.C. § 111. And DHS policy authorizes the use of "any available object or technique" in an exigent situation for self-defense or defense of another, objectively reasonable in light of the circumstances. Ex. 22 at 4. Nothing in the State's briefs explains why the federal authority to protect federal officers disappears when the officer is on a highway rather than at a target address.

**C. The State's "necessary and proper" argument is a merits argument.**

The State's central contention is that Agent Morgan's conduct "was not necessary, proper, or reasonable." State Br. 37. That is an argument about whether the immunity defense will succeed. For removal, it is enough that the defense is plausible, and the State's own legal standard—whether Agent Morgan had "an objectively reasonable and well-founded basis to believe that his actions were necessary," judged by "the circumstances as they appear to federal officers at the time," *id.* at 37 (quoting *Wyoming v. Livingston*, 443 F.3d 1211, 1222, 1229 (10th Cir. 2006))—shows why. That standard looks at what an officer on the scene knew in the seconds he had. The State's brief looks at what a viewer of the video can see afterwards.

**1. The record supports a reasonable belief in a threat.**

Crediting Agent Morgan's theory, as the Court must, the record shows the following. He and his partner were on a federal operation in an environment in which, as colleagues had warned him, agents were being boxed in, vandalized, and threatened. Doc. 72 at 308-15. Earlier that day another driver had repeatedly tried to block him, and the display of his weapon had ended it. *Id.* at 333-34; State Br. 5. At the second distress call, people threatened to kill him and threw things. Doc. 72 at 336. He was then tailed on the way out. *Id.* at 338-41. The Cadillac had tinted windows, so he could not see who was inside. *Id.* at 341. It swerved ahead of him twice, the second time with hard braking that, by his account, put him inches from the car. *Id.* at 343-44. The driver has since admitted that he intended to stop Agent Morgan's vehicle. Def. Ex. 63 at 1. Agent Morgan did not know what the driver would do next. Doc. 72 at 453. In those seconds he yelled "Police, back off" and displayed his weapon, as he had been trained to do and as he had done earlier that day. *Id.* at 344, 351, 357.

A reasonable officer could plausibly have believed that was necessary. The State's answer is that the Cadillac driver was only reacting to Agent Morgan's use of the shoulder, so there was "no immediate threat." State Br. 40-41. That is a competing inference. It may be one the finder of fact eventually adopts. It is not one the Court draws at this stage, and it is not obviously the better one. Agent Morgan did not know why the Cadillac was doing what it was doing. Doc. 72 at

340-41. The driver's own account is that he intended to stop a vehicle he suspected of being ICE and then followed it. Def. Ex. 63 at 4, 6; Def. Ex. 61 at 3.

**2. The State's "alternatives" are hindsight.**

The State argues that Agent Morgan could have turned his torso to show his vest, merged behind the Cadillac, or driven ahead. State Br. 35, 38. But the State's evidence undermines those proposals. T.B. told investigators he could not hear anything Agent Morgan shouted through the closed windows. *Id.* at 10. If a shouted identification could not be heard, a plain display of a vest while steering a vehicle at highway speed, beside a car whose occupants Agent Morgan could not see, would not plausibly have made a difference. His metal badge was locked in the trunk, Tr. 100:5-12, 318:2-10, and the rental vehicle had no lights, markings, or sirens, which the State emphasizes. State Br. 3, 37. In those circumstances a visible display of the weapon, together with the verbal command, was one of the available means of establishing officer presence. A reasonable officer could also have feared that merging behind the Cadillac invited further brake checks and that stopping on a highway would expose him to oncoming traffic. Tr. 345, 355-56.

Agency policy does not require the checklist the State proposes. The State quotes the "no reasonably effective, safe, and feasible alternative" language in Ex. 22 and Ex. 23 repeatedly. State Br. 12-13, 43. It never mentions the sentence in Ex. 23 that follows it: that the requirement "does not create a duty to retreat, a

requirement to wait for an attack before using force, an obligation to meet force with equal or lesser force, or a continuum or checklist of alternative steps that must be tried before resorting to force." Ex. 23 at 1 n.1; *see* U.S. Br. 13. And the same policy provides that "there may be a range of responses that are reasonable and appropriate under a particular set of circumstances." Ex. 22 at 2. The State's reading of the policy is not the only one, and the policy's own text contradicts the State's position.

**3. The State relies on policy only when it helps.**

The State argues at length that Officer Parodi was inconsistent about DHS and ICE policy, State Br. 19-24, 42, and that Agent Morgan violated that policy. Then it argues that policy is irrelevant to the Supremacy Clause analysis. *Id.* at 43 (citing *Christiansen v. Eral*, 52 F.4th 377, 379 (8th Cir. 2022)). It cannot have both. If policy is irrelevant, the State's policy-based critique falls away. If policy is relevant, the policies' text controls, and the text supports Agent Morgan. *See* Ex. 22 at 8 (as quoted by the United States, "[t]he act of establishing a grip, unholstering, or pointing a firearm does not constitute a use of deadly force"); Ex. 22 at 2-4; Ex. 23 at 1 n.1, 7.

Officer Parodi's credibility does not alter that. The Touhy limitations on his testimony were imposed by his agency, not chosen by the defense. In any event, the policy documents are in evidence and speak for themselves. The Court need not resolve whether Officer Parodi's testimony was consistent in order to find

that the defense is colorable. And, as the United States points out, even a violation of department policy would not defeat Supremacy Clause immunity. U.S. Br. 15-16 (citing *Clifton v. Cox*, 549 F.2d 722, 726-28 (9th Cir. 1977)).

### D. The State's expert evidence does not make the defense implausible.

The State relies on Dr. Adams for the proposition that officers are trained not to point a firearm at another motorist while driving, and that Agent Morgan's conduct was not consistent with "generally accepted police practice." State Br. 38-40. That evidence does not defeat a colorable defense, for four reasons.

*First*, "generally accepted police practice" is not the legal test. Supremacy Clause immunity asks whether Agent Morgan reasonably believed his conduct necessary, and the Court has no occasion to resolve a contest of experts about what is generally accepted in order to decide that the question is colorable. *See Todd*, 245 F.3d at 693; *Graves v. 3M Co.*, 17 F.4th 764, 771-73 (8th Cir. 2021). *Second*, Dr. Adams's core opinion rests on a premise the agency's own policy rejects: that pointing a firearm "constitutes a use of force and a threat of deadly force." State Br. 16 (quoting Ex. 27 ¶ 22). Policy states that unholstering or pointing is not a use of deadly force. Ex. 22 at 8. *Third*, the affidavit reaches conclusions about what an "objectively reasonable officer" would perceive, Ex. 27 ¶ 32, which are legal conclusions for the Court, not expert opinion. *See Nsheiwat v. Walmart, Inc.*,

No. 25-1506, 2026 WL 2386713, at 2 (8th Cir. Aug. 17, 2026), cited at U.S. Br. 18. Fourth, *the affidavit evaluates the encounter in hindsight, from the facts that were "provided to" the expert,* State Br. 16, *not "the circumstances as they appear[ed] to federal officers at the time." Id.* at 37. The Court should disregard the affidavit for purposes of removal for the reasons stated in the United States' brief. U.S. Br. 17-19.

The State also devotes two pages to excluding Dr. Rylant. State Br. 44-45. The Court does not need to reach his report. Agent Morgan's showing rests on his own testimony, Agent Codner's testimony, the video, the Cadillac driver's statements, and the agency's policy documents. The State's argument also sits uneasily with its position that "the Federal Rules of Evidence do not apply to this Court's decision" on removal. *Id.* at 44 (citing Tr. 9-10). If they do not apply, Rule 702 and *Daubert* do not exclude anything. If they do apply, they apply equally to Dr. Adams.

## IV. The Statute's Purpose Confirms Removal.

The State misreads the purpose of § 1442. The statute exists to protect federal officers from "local prejudice against unpopular federal laws or federal officials" and to preserve a federal forum for immunity defenses. *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150 (2007); *Griffin*, 175 F.4th at 901; *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981). The opening memorandum put the County Attorney's public statements about Operation Metro Surge before the Court.

Doc. 75 at 26–27 & Gubash Decl. Exs. A-M. The State's opening brief did not address them. Agent Morgan does not ask the Court to find bad faith. He asks the Court to recognize what Congress recognized: that when a state prosecutes a federal officer for an act performed in the course of a contested federal operation, the officer is entitled to have his federal defenses heard in a federal court. *See Mesa*, 489 U.S. at 139 (state hostility, where it existed, was "directed against federal officers' efforts to carry out their federally mandated duties").

The State's response now offers three answers. None succeeds. First, the State says the statute guards only against hostile state courts. State Resp. 16. But *Watson* describes the statute's concern as "local prejudice against unpopular federal laws or federal officials," 551 U.S. at 150, and the danger Congress confronted from the beginning was state prosecution of federal officers for carrying out federal law. *See id.* at 147–49; *Tennessee v. Davis*, 100 U.S. 257, 263 (1880). A prosecutor's hostility is the most direct form that prejudice can take, because the prosecutor decides whom to charge.

Second, the State says the County Attorney's statements reflect no bias. It then devotes several pages, and a lengthy footnote of news articles, to defending them on the merits: arguing that ICE engages in racial profiling, that Operation Metro Surge "resulted in chaos," and that it caused "the deaths of two U.S. citizens." State Resp. 16–20 & n.4. A response to a charge of institutional hostility toward a federal agency that consists largely of an indictment of that agency

confirms Agent Morgan's point. Nor do the judicial opinions the State quotes help it. Those are rulings by neutral judges on adversarial records in civil cases. They are not public statements by the official who decides whom to charge, and none concerns this agent or this encounter.

Third, the State says voir dire will cure any prejudice. State Resp. 20. But Supremacy Clause immunity is decided by the court before trial, not by a jury. Voir dire does nothing to address which forum decides the immunity question that § 1442 exists to protect. And the State's new Exhibit A, a compilation of other prosecutions for displaying weapons at motorists, was not offered at the § 1455(b) hearing and should be disregarded for the same reason as the post-hearing materials in the State's "TDY" footnote. *See* Part II.D, *supra*. In any event, the State does not identify a single case on that list in which the defendant was an on-duty law enforcement officer responding to a vehicle that had twice swerved into his path.

This does not strip Minnesota of its prosecution. If the Court accepts jurisdiction, the State's law and its charges remain exactly as they are. *Manypenny*, 451 U.S. at 242. The federal court will decide, on a full record, whether Agent Morgan's federal defenses succeed. If they do not, the State remains free to proceed on the merits of the charges. What Congress did not intend is that the immunity question be answered in a proceeding brought by an

official who has publicly described the federal operation as an "occupation." Doc. 75 at 26 (citing Gubash Decl. Ex. M).

## CONCLUSION

The State's brief concedes the facts that matter, applies a test for prong two that *Plaquemines* has displaced, and argues the merits of the defense where the statute asks only whether it is colorable. Agent Morgan was a federal officer on duty and under orders. The charged act arose from, and relates to, his response to what he perceived as an attack in the course of that duty. His federal defenses of Supremacy Clause immunity, self-defense, and defense of others are plausible.

The thought that an on-duty federal officer, facing an exigency created by an assaultive driver, cannot brandish (or even point!) his firearm to announce officer presence, deescalate a dangerous situation, and protect himself and his partner is stranger than fiction. And the thought that this case somehow does not belong in federal court, when the correct standards are applied, is even wilder. Yet that is exactly what Hennepin County persists in. The Court should confirm jurisdiction under 28 U.S.C. § 1442 and deny the State's request to remand.

Dated: November 19, 2026

By: /s/ *Ryan Pacyga*
PACYGA TRIAL LAWYERS

Ryan M. Pacyga (No. 321576)
Marie C. Pacyga (No. 391493)
860 Blue Gentian Road, Suite 175
St. Paul, MN 55121
(612) 339-5844
Ryan@MNTrialLaw.com
Marie@MNTrialLaw.com

*Attorneys for Defendant*

UPPER MIDWEST LAW CENTER
Douglas P. Seaton (No. 127759)
Rachel K. Paulose (No. 0280902)
12600 Whitewater Dr., Suite 140
Minnetonka, MN 55343
(612) 428-7000
Doug.Seaton@umlc.org
Rachel.Paulose@umlc.org

*Attorneys for Defendant*